711 A.2d 990

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Joseph RICO, Appellee.**

Supreme Court of Pennsylvania.

Argued Oct. 18, 1996.

Decided April 27, 1998.

Reargument Denied June 24, 1998.

Catherine Marshall, Marilyn F. Murray, Philadelphia, for Com.

Jack M. Myers, Philadelphia, for Joseph Rico.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

FLAHERTY, Chief Justice.

This is a discretionary appeal from an order of the Superior Court vacating the judgment of sentence of the Court of Common Pleas of Philadelphia County and remanding for a new trial. *Commonwealth v. Rico,* 443 Pa.Super. 507, 662 A.2d 1076 (1995). We reverse and remand.

Appellee, Joseph Rico, was found guilty by a jury of first degree murder of Robert Hornickle and was sentenced to life imprisonment. Hornickle was killed in January, 1983, after he tried to recover $14,000 he had given to Ronald DeCaprio and appellee in an unsuccessful attempt to buy marijuana. On appeal, Superior Court vacated the judgment of sentence and remanded for a new trial, concluding that the trial court erred in failing to strike the jury panel as a result of the prosecutor's use of peremptory challenges to exclude jurors of Italian descent because such use violated appellee's rights under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Allocatur was granted on the issue of whether *Batson* applies where the prosecutor, in a case allegedly involving organized crime, has exercised peremptory challenges to disqualify prospective jurors of Italian descent.

Appellant, the Commonwealth, contends that the Superior Court incorrectly assumed *Batson* applies to Italian–Americans and, further, improperly disregarded the trial court's factual findings regarding the *Batson* claim. The following first addresses *Batson* and its progeny, then focuses on this court's jurisprudence, and finally addresses the issues before us.

The court in *Batson* held that a black state criminal defendant can raise an equal protection challenge by showing that the prosecutor used peremptory challenges for the purpose of excluding from the jury members of the defendant's race. 476

U.S. at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87–88. The court explained that although a prosecutor ordinarily is entitled to exercise peremptory challenges for any reason related to his or her view concerning the outcome of the case, the equal protection clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the state's case against the black defendant. *Id.* at 87, 106 S.Ct. at 1718, 90 L.Ed.2d at 81. Racial discrimination in selection of jurors, the court said, harms not only the accused and the potential jurors and but also the public's confidence in the fairness of our system of justice. *Id.*

The *Batson* Court then stated that a defendant demonstrates a prima facie case of purposeful discrimination by showing that the totality of the relevant facts give rise to an inference of discriminatory purpose. *Id.* at 93–94, 106 S.Ct. at 1722, 90 L.Ed.2d at 86. A prima facie case of a prosecutor's discriminatory exercise of peremptory challenges can be demonstrated by showing the defendant is a member of a cognizable racial group and the prosecutor exercised peremptory challenges to remove from the venire members of the defendant's race. *Id.* at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87. In proving discrimination, the "defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' " *Id.* These facts and any other relevant circumstances "raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Id.* at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87–88.

Once the defendant makes out a prima facie case, the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation. *Id.* at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88.[1] The prosecutor's explana-

1. The court recently explained that the burden is to articulate a non-discriminatory reason, even if the reason arguably makes no sense. *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995).

tion, however, need not rise to the level justifying exercise of a challenge for cause. *Id.*

The trial court must then decide whether the opponent of the strike has proved purposeful discrimination. *Id.* at 96–98, 106 S.Ct. at 1723, 90 L.Ed.2d at 87–88. The trial judge has before him or her the entire venire and is well situated to detect whether a challenge to the seating of one juror is part of a pattern of singling out members of a single race for peremptory challenges. *Id.* at 97–98, 106 S.Ct. at 1723–24, 90 L.Ed.2d at 88–89. Thus, deference to the trial court's finding on the issue of discriminatory intent makes particular sense because the finding largely will turn on an evaluation of credibility. *Id.* at 98 n. 21, 106 S.Ct. at 1724 n. 21, 90 L.Ed.2d at 88–89 n. 21.

The Court extended *Batson* to other types of criminal cases, to civil cases and to cases alleging gender discrimination. *Batson* was held to apply in opposite race cases and to defendants. *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (white state criminal defendant can object on equal protection grounds to the exclusion of black venire-persons through prosecutor's use of peremptory challenges); *Georgia v. McCollum,* 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) (*Batson* prohibits a white criminal defendant from using peremptory strikes to exclude black members from defendant's jury on account of their race). *Batson* was applied in a case involving the use of challenges on the basis of racial and ethnic classifications. *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (use of peremptory challenges to exclude two Latin–American, Spanish-speaking jurors did not violate the defendant's equal protection rights where jurors appeared to refuse to accept the official court interpreter's English translation). *Batson* was extended to civil cases. *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (*Batson* applies in civil case with respect to classifications based on ancestry or skin color). And, *Batson* was further extended to gender cases in *J.E.B. v. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (in a paternity and child support

suit, equal protection clause prohibits gender discrimination in jury selection.)

This court has likewise held that the intentional, discriminatory use of peremptory challenges by a prosecutor to exclude from the jury members of the defendant's race or gender violates the equal protection clause. *Commonwealth v. Hardcastle*, 519 Pa. 236, 546 A.2d 1101 (1988) (race-based peremptory challenges); *Commonwealth v. Jones*, 542 Pa. 464, 668 A.2d 491 (1995) (gender-based peremptory challenges).

In *Commonwealth v. Hardcastle, supra*, this court stated, as was articulated in *Batson*, that a criminal defendant has the burden of establishing a prima facie case of purposeful discrimination by showing that:

1.  the defendant is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race;

2.  the peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate; and

3.  facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the venire persons from the petit jury on account of the race of those persons.

*Commonwealth v. Hardcastle, supra*, 519 Pa. at 243, 546 A.2d at 1104. It is the combination of these factors in the selection of the jury that raises the necessary inference of purposeful discrimination. *Commonwealth v. Dinwiddie*, 529 Pa. 66, 70–71, 601 A.2d 1216, 1218 (1992). The striking of a number of individuals belonging to some cognizable minority group, however, is not dispositive that a violation of *Batson* has occurred. *Commonwealth v. Abu–Jamal*, 521 Pa. 188, 197, 555 A.2d 846, 850 (1989).

This court requires the defendant in his or her prima facie case to make a record concerning peremptory challenges specifically identifying:

534

1. the race or gender of all the venirepersons in the jury pools;

2. the race or gender of all venirepersons remaining after challenges for cause;

3. the race or gender of those removed by the prosecutor; and

4. the race or gender of the jurors who served and the gender of jurors acceptable by the Commonwealth who were stricken by the defense.

*Commonwealth v. Spence,* 534 Pa. 233, 246, 627 A.2d 1176, 1182–83 (1993); *Commonwealth v. Jones, supra,* 542 Pa. at 519, 668 A.2d at 518.

■■■■ After such a record is established, the trial court is to consider the totality of the circumstances to determine whether challenges were used to exclude venirepersons on account of race or gender. *Id.* If the court finds in the affirmative, the prosecutor is to offer neutral reasons for each of its strikes. Racially neutral uses of strikes were found in: *Commonwealth v. Hardcastle,* 519 Pa. 236, 243, 546 A.2d 1101, 1104 (1988) (one juror was young and unemployed and another juror had a relative who had been killed in a violent crime); *Commonwealth v. Bond,* 539 Pa. 299, 310, 652 A.2d 308, 313 (1995) (jurors equivocated on the death penalty or had a relative who had been convicted of murder); *Commonwealth v. Griffin,* 537 Pa. 447, 459, 644 A.2d 1167, 1173 (1994) (jurors were reluctant to impose the death penalty or had a short employment record). *But see, Commonwealth v. Horne,* 535 Pa. 406, 635 A.2d 1033 (1994) (prosecutor's reason for exclusion, that prospective juror lived in "high crime" area and was therefore desensitized to crime, was not race-neutral as applied to individual juror excluded (equally divided court)). The reasons for the challenge need not rise to the level of a "for cause" challenge. *Commonwealth v. Jones,* 542 Pa. at 520 n. 31, 668 A.2d at 519 n. 31. The findings of the trial court are to be given great deference on appeal and will not be disturbed absent a determination that the trial court's ruling was clearly erroneous. *Commonwealth v. Young,* 536 Pa. 57, 69–71, 637 A.2d 1313, 1319 (1993).

The Commonwealth first argues that appellee failed to establish a prima facie case because Italian–American are not a cognizable group warranting protection from discrimination under *Batson*. The question of whether *Batson* extends to the ethnic classification of Italian–Americans has not been addressed by the U.S. Supreme Court or this court.

The U.S. Supreme Court's jurisprudence, however, leads to a conclusion that *Batson* can apply to purposeful discrimination in the use of peremptory challenges in jury selection based solely on ethnicity. The Court in *Batson* cited *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) ( Mexican–Americans are a cognizable group under the equal protection clause). *Batson*, 476 U.S. at 96, 106 S.Ct. at 1722–23, 90 L.Ed.2d at 87. *See, Hernandez v. New York, supra* (court examined peremptory challenges to members of ethnic group (Spanish-speaking Latin Americans) in the context of race discrimination).

The circuits that have looked at this issue have assumed, or have sidestepped the issue of whether, *Batson* applies generally to peremptory challenges on the basis of ethnicity. The circuits have usually decided that defendants presented no prima facie showing that, under *Batson*, Italian–Americans (or persons with Italian surnames) are a cognizable group that has been or is currently subjected to discriminatory treatment. *United States v. Campione*, 942 F.2d 429, 432–33 (7th Cir.1991); *United States v. Bucci*, 839 F.2d 825, 833 (1st Cir.1988), *cert. denied*, 488 U.S. 844, 109 S.Ct. 117, 102 L.Ed.2d 91; *United States v. DiPasquale*, 864 F.2d 271, 276 (3rd Cir.1988), *cert. denied*, 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989); *United States v. Angiulo*, 847 F.2d 956, 984 (1st Cir.1988), *cert. denied*, 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 332 (1988); *United States v. Sgro*, 816 F.2d 30, 33 (1st Cir.1987), *cert. denied*, 484 U.S. 1063, 108 S.Ct. 1021, 98 L.Ed.2d 986 (1988). *See also, Murchu v. United States*, 926 F.2d 50, 54 (1st Cir.1991), *cert. denied*, 502 U.S. 828, 112 S.Ct. 99, 116 L.Ed.2d 70. (Americans of Irish ancestry were not a cognizable group for purpose of *Batson* claim that a prosecutor's use of peremptories to exclude jurors with Irish sur-

names violated equal protection). *But see, United States v. Biaggi,* 909 F.2d 662, 678–79 (2d Cir.1990), *cert. denied,* 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991) (Italian–American are cognizable group but prosecutor's explanations were neutral and not pretextual).

Cognizability, according to some circuits, is demonstrated by defendant's showing that an ethnic group is singled out for discrimination by the community and, thus, needs to be protected from community prejudices. A defendant must show the ethnic group: (1) is defined and limited by some clearly identifiable factor or factors; (2) possesses a common thread of attitudes, ideas or experiences; (3) shares a community of interests such that the group's interest cannot be adequately represented if the group is excluded from the jury selection process; and, (4) has experienced or is experiencing discriminatory treatment and is in need of protection from community prejudices. *United States v. Di Pasquale, supra,* 864 F.2d at 277; *United States v. Bucci, supra,* 839 F.2d at 833 n. 11; *United States v. Sgro, supra,* 816 F.2d at 33.

We conclude that whether Italian–Americans comprise a cognizable group needing protection from community prejudices for purposes of *Batson* is a question of fact within the sound discretion of the trial court. In order to demonstrate cognizability, a defendant must show the ethnic group: (1) is defined and limited by some clearly identifiable factor or factors; (2) possesses a common thread of attitudes, ideas or experiences; (3) shares a community of interests such that the group's interest cannot be adequately represented if the group is excluded from the jury selection process; and, (4) has experienced or is experiencing discriminatory treatment and is in need of protection from community prejudices. The mere spelling of a person's surname is insufficient to show that he or she belongs to a particular ethnic group. And, a conclusory statement that "Italian–Americans comprise a recognizable ethnic group," without more, does not constitute the requisite showing that Italian–Americans are a cognizable group for purposes of a *Batson* challenge.

The Superior Court suggests that the cognizability test be discarded because the focus of *Batson* is on the "discriminatory pattern allegedly employed."[2]    The court suggests that our *Batson* jurisprudence be replaced with a test probing whether the three purposes of *Batson* are served, i.e., a litigant's right to a jury selection process free of discrimination; a prospective juror's right to participate in a civic duty with confidence that he or she was evaluated by virtue of ability to serve, regardless of race or ethnic heritage; and, the community's right to an unquestioned belief that our system of justice operates without discrimination at every level.    *Commonwealth v. Rico, supra,* 443 Pa.Super. at 514, 662 A.2d at 1080.

The Superior Court's position fails to recognize that *Batson* jurisprudence is grounded on the equal protection clause which prohibits the discriminatory use of peremptory challenges on the basis of classification, i.e., membership in a cognizable group that has been singled out for discrimination by the community.    Racial and gender groups have been singled out for discrimination to such an extent in communities of this nation that cognizability for these groups is generally recognized by the courts.    The cognizability test, though, remains as the first inquiry in a *Batson* challenge and the evolution of *Batson* leads to no other conclusion.    Thus, where the prosecutor, in a case allegedly involving organized crime, has exercised peremptory challenges to disqualify prospective jurors of Italian descent, the person challenging such use must first establish that Italian–Americans are a "cognizable group" before proceeding with the remaining steps of the *Batson* analysis.

Here, assuming the cognizability test was met in this case, no error on the part of the trial court has been demonstrated. The record reflects the following.    Voir dire of prospective

**2.**    The court stated:

> If any identifiable group is excluded on the basis of race, gender, ethnicity, or other reason not related to a perception that the individual member would be unable to adequately perform the functions and duties required of a juror in the case presented, impermissible discrimination has occurred.

*Commonwealth v. Rico, supra,* 443 Pa.Super. at 513, 662 A.2d at 1079.

venirepersons for appellee's trial consumed four days. Prior to swearing in the first panel of prospective jurors, the trial court and counsel agreed to the questions the court would direct members of the panel to answer. They included inquiries with respect to a juror's age, occupation, place and length of residence, as well as a specific question, composed by the trial court, regarding a prospective juror's ability to be fair and impartial in light of "evidence in this case that might tend to connect the defendant and/or one or more of the witnesses with organized crime." According to the trial court, the question was designed to benefit the prosecution as well as the defense, since it would elicit "whether they would have a prejudice."

*Batson* challenges began with the prosecutor's third peremptory challenge. When appellee raised a *Batson* objection to the Commonwealth's use of its third and sixth peremptory challenges to strike potential jurors, Enrico Salvator and Linda Giordano,[3] the trial court overruled the objections because appellee failed to establish that the venirepersons were of Italian descent. The following day, the court, after hearing argument, ruled that while the application of *Batson* to persons of Italian descent was unprecedented, she would, "in an abundance of caution," request the prosecutor to state his reason for further peremptory challenges of jurors who, by virtue of their current surnames, appeared to be of Italian descent. The trial court noted that "the record shows a purposeful exclusion or pattern of exclusion on the part of [the] Commonwealth on anybody who appears to be of Italian descent."

When the Commonwealth exercised its ninth peremptory challenge against venireperson Mary Tucci, whom the Commonwealth conceded was of Italian descent, the trial court asked for the reason for the strike. The court accepted

3. On appeal, appellee asserted that the Commonwealth exercised its second peremptory challenge in a discriminatory manner to strike Cathy Roba. The record reflects, however, that appellee did not object to the striking of Ms. Roba and did not establish that she was of Italian descent.

as ethnically neutral the prosecutor's response that he believed the witness would not comprehend the facts of the case. When the Commonwealth's eleventh peremptory challenge was used against prospective juror Vincent Giorgi, who was of Italian descent, the trial court asked for the reason for the strike. The prosecutor said he thought he saw "fear in [Giorgi's] demeanor and his voice when organized crime was mentioned and that in conjunction with his Italian background led me to believe he would not be a juror suitable with this case." Further voir dire by the court reflected that the witness equivocated about whether the organized crime connections of the case would affect his ability to serve. The trial court accepted the prosecutor's explanation for the strike.

The prosecutor's thirteenth peremptory challenge against potential juror Susan Bratrolla, whom the Commonwealth conceded was of Italian descent, was explained by the fact that she lived "in South Philadelphia in an area over which the mob will speak and I think she's subject to intimidation in an abundance of caution I'm striking her." The trial court found the reason was ethnically neutral.

The twentieth peremptory challenge was against potential alternate juror John Taconelli whom the prosecutor struck because he thought Taconelli was a "very strange person" and hesitated when asked by the trial court if the fact the case involved organized crime would affect his ability to be fair and impartial. The trial court accepted the prosecutor's explanation for the strike.

Assuming *Batson* was triggered here, the Superior Court erred in rejecting the trial court's factual finding of no purposeful discrimination.[4] The Superior Court concluded that the Commonwealth had discriminatorily used peremptory challenges based on the court's own subjective assessment that the prosecutor had failed to articulate nondiscriminatory reasons for his peremptory challenges of Mr. Giorgi and Ms.

4. The Superior Court did conclude that the prosecutor's reasons for striking Ms. Tucci and Mr. Taconelli were ethnically neutral. *Commonwealth v. Rico,* 443 Pa.Super. at 518, 662 A.2d at 1081 (1995).

Bratolla. The appropriate review is whether the trial court's findings were clearly in error. Here, the trial court found that the prosecutor's reasons were ethnically neutral based on the testimony and its observations of the two individuals. Giving deference to the trial court's findings grounded on credibility determinations, we find no clear error that would warrant a disturbance of the trial court's conclusions.

Reversed and remanded for further proceedings consistent with this opinion.[5]

ZAPPALA, J., files a concurring opinion.

CASTILLE, J., files a concurring opinion in which NEWMAN, J., joins.

CAPPY, J., concurs in the result.

NIGRO, J., files a dissenting opinion.

ZAPPALA, Justice, concurring.

Six years ago in *Commonwealth v. Dinwiddie*, 529 Pa. 66, 601 A.2d 1216, 1221 (1992), I authored a concurring opinion in which I raised the question whether "the practice of allowing peremptory challenges has become such a burden to the system that it would be better to discard it entirely." The issue there was whether the defendant had made out a prima facie case that the prosecutor exercised peremptory challenges in a discriminatory manner. The trial court had found no prima facie case of discrimination and had not required the prosecutor to set forth reasons for the challenges.

It seemed to me then that we were "headed for much contentious litigation over questions germane not to the guilt or innocence of the accused, but to the fairness, or apparent fairness, of the process by which guilt or innocence is determined." *Id.* at 1222. I concluded by suggesting that "[i]nstead of pushing our courts into the morass of trying to judge between explanations for the irrational, perhaps the entire

5. The Superior Court did not reach the issue of prosecutorial misconduct. *See Commonwealth v. Rico, supra,* 443 Pa.Super. at 512 n. 1, 662 A.2d at 1078 n. 1 (1995).

process would be better served by abandoning the use of peremptory challenges altogether, trying cases before the first group of twelve jurors randomly chosen from the venire, and allowing only challenges for cause." *Id.* at 1222–23.

Two years later, in *Commonwealth v. Horne,* 535 Pa. 406, 635 A.2d 1033 (1994), I authored an Opinion in Support of Reversal reiterating these observations. In that case, the difficulty centered on appellate review of the trial judge's ruling. The trial judge had found that the prosecutor's explanation for his peremptory challenges were race-neutral and not pretextual, but the Superior Court reversed the judgment of sentence and ordered a new trial.

Today the Court concludes that it is a question of fact, within the trial court's discretion, whether an ethnic group (in this case Italian–Americans) comprises a cognizable group such that the same scrutiny of peremptory challenges may be invoked. Mr. Justice Castille rightly identifies the "potentially troublesome ramifications of the test that the Court sets forth" to decide this question, Concurring Opinion at 997, describing it as "an albatross" which we must place around the necks of the trial courts, *id.* at 1000.

Although I agree with Mr. Justice Castille's sentiments, I disagree that this is a course we "must" follow. I respectfully suggest once again that "the entire process would be better served by abandoning the use of peremptory challenges altogether, trying cases before the first group of twelve jurors randomly chosen from the venire, and allowing only challenges for cause." 601 A.2d at 1222.

CASTILLE, Justice, concurring.

I join the opinion announcing the judgment of the court as I agree that the Superior Court erred in determining that the prosecutor purposefully discriminated on the basis of ethnicity in exercising peremptory challenges. Nevertheless, I write separately because of the potentially troublesome ramifications of the test that the Court sets forth to determine

whether an ethnic group is "cognizable" for *Batson*[1] purposes. I do not, however, imply any criticism of the Court in this discussion, as I believe that the Court has been compelled to promulgate a test of this nature in light of the United States Supreme Court's incomplete resolution of the issues implicated by *Batson* and its progeny.

According to the United States Supreme Court, a *Batson* challenge does not stem from any right held by the defendant, but rather from the Fourteenth Amendment right to equal protection held by the prospective *juror*, which is asserted by the defendant via third-party standing doctrine. *See Powers v. Ohio*, 499 U.S. 400, 413–14, 111 S.Ct. 1364, 1372–73, 113 L.Ed.2d 411 (1991)(acknowledging that *Batson* claim is asserted via third-party standing under Fourteenth Amendment, and thus the race of defendant is irrelevant in determining defendant's standing to make *Batson* objection). In *J.E.B. v. Alabama Ex Rel. T.B.*, 511 U.S. 127, 137, 114 S.Ct. 1419, 1425–26, 128 L.Ed.2d 89 (1994), the Supreme Court applied traditional equal protection principles in determining that not only race-based peremptory challenges, but also gender-based challenges were unconstitutional. Specifically, the Court invoked the standard intermediate-tier scrutiny to find that the state had no compelling reason to exercise peremptory challenges on the basis of gender. *See id.* at 135–57, 114 S.Ct. at 1424–36. Citing the "history of total exclusion" from jury service shared by African–Americans and females, the Court determined that judicial intervention was warranted to prevent the further proliferation of a particularly repugnant stereotype—a stereotype sanctioned by law for much of this nation's existence—that these particular groups of people cannot dispassionately and rationally weigh evidence in a legal matter. *Id.*

Left in the wake of *Batson* and *J.E.B.* was the question of whether some ethnicity-based stereotypes are, like race-based and gender-based stereotypes, so repugnant and historically pervasive as to mandate judicial intervention, and if so, *which* ethnic groups are to be protected? Although the Supreme

---

1. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

Court has never explicitly determined whether peremptory challenges may be exercised on the basis of a juror's ethnicity,[2] the logic of traditional equal protection doctrine would suggest that ethnicity is also a prohibited basis of discrimination in the jury selection process. If gender-based peremptories cannot survive **intermediate**-tier scrutiny, it would seem to follow almost axiomatically that ethnicity-based peremptories would be unconstitutional under the standard **strict** scrutiny analysis that applies to all classifications based on ethnicity or national origin—regardless of the particular ethnicity at issue.[3] *See, e.g., Miller v. Johnson,* 515 U.S. 900, 913, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995).

The full force of this logic would lead diligent defense attorneys to make a record of the ethnic background of each venireperson and then raise a *Batson* challenge every time a juror with any identifiable ethnic background was stricken, in the hope that an appellate court would view as pretextual the prosecutor's proffered reason for the strike and thereby order a new trial.[4] Trial courts would have to determine the ethnic

---

**2.** In *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395, the Supreme Court held that an exercise of a peremptory challenge on the basis that the prospective juror was bilingual (Spanish–English) and unlikely to accept the Court's translations was acceptable. In so holding, the Court declined to address the threshold issue of whether the defendant had made out a prima facie case that the juror had been discriminated against on any basis that *Batson* forbids, deciding that the issue was moot due to the prosecutor's proffer of a race-neutral explanation for the challenge. *See id.* at 357, 111 S.Ct. at 1865. Thus, the issue of whether ethnic groups are included under *Batson*'s wing is technically still unresolved.

**3.** Strictly speaking, there is no sound analytical rationale for subdividing ethnic groups for purposes of the equal protection clause. Yet the failure of the United States Supreme Court to speak further to this issue has compelled the state courts and the lower federal courts to do precisely that, as discussed *infra.*

**4.** In this regard, I note that there is no allowance for "harmless error" review in the context of *Batson* claims. While it might seem quite non-prejudicial, for example, if a prospective white juror is discriminated against on the basis of his race in the trial of an African–American defendant, an appellate court may not determine that the *Batson* error is harmless even in such a case. *See J.E.B., supra,* 511 U.S. at 159, 114 S.Ct. at 1437 (Scalia, J., dissenting)(citing *Powers v. Ohio,* 499 U.S. 400, 415, 111 S.Ct. 1364, 1373, 113 L.Ed.2d 411 (1991)). Thus, any time

background of all prospective jurors,[5] and would then have to rule on the adequacy of a potentially indeterminate series of *Batson* challenges followed by ethnicity-neutral proffers.

Perhaps because appellate courts fear the above-described result, they have uniformly—and wisely in my opinion—ignored the logic of the equal protection doctrine that would seem to inevitably compel this result. Realizing that it would be unnecessary and overburdensome to include *all* ethnic groups under *Batson*'s paternal wing, courts have foreclosed the possibility of continuous *Batson* challenges by limiting the ethnic groups that are "cognizable" for purposes of *Batson*. The problem that courts have had is deciding where to draw the line among ethnic groups.[6] Today, in an attempt to guide the courts of the Commonwealth in their resolution of the vexing issues of whether and where to draw the line, this Court adopts the same test that has been uniformly adopted by the federal courts that have considered this issue.[7] Al-

the appellate courts of this Commonwealth determine that a trial court erred by denying ethnic "cognizability" or by improperly accepting an ethnicity-neutral proffer, a new trial is automatically mandated.

5. Determining a juror's ethnicity could itself prove burdensome. For example, in the matter under consideration, would an Anglo–Saxon woman married to an Italian–American man be considered Italian–American for purposes of the jury selection process? To discriminate against a white woman because she married an African–American man would obviously violate equal protection doctrine; thus, it would seem reasonable for defense counsel to argue that a peremptory challenge was impermissibly exercised against a woman because she had married an Italian–American. What degree of consanguinity would trigger the required race-neutral proffer by the challenging party? Taken to its logical extension, trial counsel would be able to delve interminably into each prospective juror's family background to discover a hint of ethnicity in an attempt to trigger a *Batson* challenge. These are some of the problems that the logic of traditional equal protection doctrine seems to compel courts to address in the wake of *Batson*.

6. Trial courts in our sister states have been unable to agree on whether *any* of the following ethnic groups, *inter alia*, are "cognizable" for *Batson* purposes: Spanish Americans, Mexican Americans, Asian Americans, Native Americans, Italian Americans, Irish Americans and Jewish Americans. *See* Jay M. Zitter, Annotation, *Use of Peremptory Challenges to Excluded Ethnic and Racial Groups, other than Black Americans, from Criminal Juries Post–Batson State Cases*, 20 A.L.R. 5th 398 (1994).

7. *See Murchu v. United States*, 926 F.2d 50, 54 (1st Cir.1991); *United States v. DiPasquale*, 864 F.2d 271, 282 (3rd Cir.1988), *cert. denied*, 492

though I am unable to devise a better test for determining ethnic "cognizability," I wish to point out the predicament that our courts are likely to face as they attempt to apply this test—a predicament which further underscores the need for the United States Supreme Court to decisively address the issues of whether ethnic groups are "cognizable" for *Batson* purposes and, if so, where the lines should be drawn.[8]

The test set forth by the Court consists of four parts.[9] Each part is fact-intensive and will require the trial judge to

U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989), *United States v. Dennis,* 804 F.2d 1208, 1210 (11th Cir.1986), *cert. denied,* 481 U.S. 1037, 107 S.Ct. 1973, 1974, 95 L.Ed.2d 814 (1987).

**8.** My own view is that *Batson* is not properly extended to *any* group besides those defined by race and gender. It is only the "history of total exclusion" from jury participation—a history that is shared *exclusively* by African–Americans and women—that compelled the prohibition of race- and gender-based peremptories in *Batson* and *J.E.B.. See J.E.B., supra,* 511 U.S. at 135 and 142 n. 14, 114 S.Ct. at 1424–25 and 1428 n. 14. Justice O'Connor, who provided the fifth vote necessary for a majority opinion in *J.E.B.,* also wrote a concurring opinion expressing her belief that the extension of the *Batson* principle should be limited to the government's use of *gender*-based strikes. *See id.* at 147–49, 114 S.Ct. at 1430–32. Even the majority opinion in *J.E.B.* suggests that peremptory challenges exercised on the basis of race or gender are unconstitutional not because they stereotype the prospective juror as one who will be partial to one side in a particular case, but because they harken back to the much more repugnant stereotype that African–Americans and women do not have the rational minds necessary to find the facts dispassionately in *any* case. *See id.* at 142 n. 14, 114 S.Ct. at 1428 n. 14 ("where peremptory challenges are made on the basis of group characteristics *other* than race or gender, they do *not* reinforce the same stereotypes about the group's competence or predispositions that have been used to prevent them from voting, participating on juries, pursuing their chosen professions, or otherwise contributing to civic life") (citation omitted)(emphasis added). Quite simply, no ethnic group in this country shares this same history of categorical, state-sanctioned exclusion from jury participation. In the aggregate, I believe that these are compelling indications that the United States Supreme Court would not—and should not—make ethnicity a prohibited basis of discrimination in the jury selection process. However, in light of the inherent tension of my proposed conclusion with traditional equal protection doctrine, which affords greater protection against ethnicity-based discrimination than against gender-based discrimination, I will not leap to this conclusion ahead of the United States Supreme Court.

**9.** Specifically, the test provides that an ethnic group is "cognizable" if the trial court finds that it: (1) is defined and limited by some clearly

conduct a hearing to determine whether the ethnic group at issue satisfies that part. Application of the four parts of this test will potentially embroil our trial courts in a quagmire of tedious factfinding.[10]

First, our courts will have to determine whether an ethnic group possesses a sufficiently "common thread of attitudes, ideas and experiences." One need not strain one's imagination to foresee the potential for intractable factual disputes over this issue alone. For example, if a defendant alleges that Irish–Americans have been improperly excluded from the jury, the defendant will have to call Irish–American witnesses, whose testimony may or may not establish a common thread of attitudes, ideas and experiences. Depending on how the trial judge exercises her discretion, the court might then hear Irish–American rebuttal witnesses from the prosecution, testifying that they do not share the alleged common attitudes and ideas. The defense will undoubtedly conduct extensive cross-examination as to how any Irish–American could not share such ideas or attitudes at some level.

Next, the defendant will need to show that Irish–Americans share a "community of interests" that cannot be adequately represented by another group if they are excluded from the jury. Presumably, the prosecutor at this point will call members of other ethnic groups who are represented on the jury to try to elicit information that would show that the interests of Irish–Americans, whatever they are, would be equally well represented by the other jury members of different ethnicity.

The trial court will now be ready to hear testimony on whether Irish Americans have experienced or are experiencing discriminatory treatment in the community and are in

identifiable factor or factors; (2) possesses a common thread of attitudes, ideas or experiences; (3) shares a community of interests such that the group's interests cannot be adequately represented if the group is excluded from the jury selection process; and (4) has experienced or is experiencing discriminatory treatment and is in need of protection from community prejudices.

**10.** Before trial courts can even apply this test, they must of course determine the ethnicity of the juror at issue, which means that they will have to address the concerns raised in footnote five, *supra*.

need of protection from community prejudice. This will likely involve Irish–American witnesses detailing the discrimination they have faced, rebutted by other witnesses who may testify that they have advanced to positions of power and prestige without facing noticeable discrimination. Finally, at the end of this minitrial, the trial judge will be ready to address each of the prongs in the four-part test and determine whether Irish–Americans are a "cognizable" group for *Batson* purposes.

Moreover, because the litigant is asserting the *jurors'* rights, the trial court might well have to conduct several of these minitrials before it can empanel a jury. A party may object to a peremptory strike (as well as appeal a ruling that a peremptory strike was valid) any time the strike was made against a member of a group that *Batson* and its progeny protect from discrimination, irrespective of whether the strike affected the **defendant's** right to a fair trial. *See Powers v. Ohio,* 499 U.S. 400, 413–14, 111 S.Ct. 1364, 1377–79 113 L.Ed.2d 411, 426–27 (1991). Accordingly, any time a juror with some vaguely identifiable ethnic background is excused, a litigant may raise a *Batson* challenge. Before she can make a ruling, the trial judge will have to determine whether the juror's ethnic background is cognizable.

Thus, the test that we are constrained to promulgate today has the potential to envelop our trial courts in a tedious factfinding process at the jury selection stage, generate inconsistent determinations on whether certain ethnic groups are cognizable, and ultimately present this Court with intractable legal issues concerning what facts establish legal "cognizability." I do not believe that the United States Supreme Court intended this result, but I do believe that this result or one similar to it is dictated by any plain understanding of the principles set forth in *Batson* and its progeny. The only alternatives are either to acknowledge that *all* ethnic groups are cognizable for purposes of a *Batson* challenge—and face the consequences of such a decision—or assert that *no* ethnic group is cognizable. I believe that the former alternative constitutes the height of absurdity as it would, without any

sound justification, "increase the number of cases in which jury selection—once a sideshow—will become part of the main event." *J.E.B., supra,* 511 U.S. at 147, 114 S.Ct. at 1431 (O'Connor, J., concurring). While I find the latter alternative the only logical solution to the issue raised, I cannot endorse that alternative for the aforementioned reasons (fn.8, *supra* ). Consequently, I take this opportunity to urge the United States Supreme Court to clarify the outer limits of *Batson* so that our trial courts may be relieved of the albatross which we must place around their necks for the present.

NEWMAN, J., joins this concurring opinion.

NIGRO, Justice, dissenting.

I cannot accept the Majority's conclusion that the trial court did not err in finding that the prosecution's use of peremptory challenges against Mr. Giorgi and Ms. Bratolla were not impermissibly discriminatory. Therefore, I must respectfully dissent.

Preliminarily, the Majority assumes that Italian–Americans meet the cognizability test set forth in its opinion. I believe that the cognizability test adopted by the Majority, as it is set forth, imposes a burden of proof on individuals raising *Batson* claims which is not in accord with the letter or the spirit of *Batson.*[1] In addition, as Justice Castille aptly points out in his

1. The Majority adopts a four-part cognizability test set forth in *United States v. DiPasquale,* 864 F.2d 271, 277 (3rd Cir.1988) to guide the trial courts in making their cognizability determinations. However, the fourth part of the cognizability test, which requires an individual raising a *Batson* challenge to show that the group being excluded from the venire has experienced or is experiencing discriminatory treatment and is in need of protection from community prejudices is, in my opinion, not in accord with *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *Batson* expressly states that an individual raising an equal protection claim based on impermissible discrimination in jury selection need only show that a cognizable group is being impermissibly singled out in his or her particular venire. *Id.* at 80, 106 S.Ct. at 1713–14, 90 L.Ed.2d at 76–77. In addition, to show the cognizability of a group, *Batson* requires only that the individual raising the challenge prove that the group being discriminated against in the venire is capable of being singled out for differential treatment. *Id.* at 94, 106 S.Ct. at 1722, 90 L.Ed.2d at 86. Therefore, I would recom-

concurring opinion, the Majority's delegation of the responsibility of determining whether specific ethnic groups are cognizable for *Batson* purposes to the trial courts has troubling ramifications.[2] While I do not agree with the conclusion that determinations of specific ethnic groups' cognizability should be left to the trial courts or with the cognizability test set forth by the Majority,[3] for purposes of this dissent I will adopt their assumption that Italian–Americans are a cognizable ethnic group for *Batson* purposes.[4] However, even applying the

mend that the Majority not adopt the four-part cognizability test set forth in *DiPasquale,* because it imposes a higher burden of proof on individuals raising *Batson* challenges than is required by our United States Supreme Court.

2. Justice Castille's concurrence recognizes the onerous fact-finding task which is being delegated to the trial courts as a result of the Majority's decision. The trial courts will have to make factual determinations regarding the cognizability of any number of ethnic groups on a case-by-case basis. I believe that this Court should make a general determination as to the cognizability of any and every specific ethnic group for *Batson* purposes. Such a determination would alleviate the fact-finding responsibility of the trial courts, and would eliminate the possibility of inapposite determinations of specific ethnic groups' cognizability for *Batson* purposes which will inevitably result from the case-by-case cognizability determinations ordered by the Majority's holding.

3. The majority would leave the issue of a particular ethnic group's cognizability for *Batson* purposes to the trial courts' sound discretion. I cannot agree with this proposition. The trial courts are designed to effect justice in particular cases, not to proclaim the close identity and oppressed status of one ethnic group versus another's. This Court has recognized that race and gender always establish cognizability pursuant to *Batson,* thereby providing sound guidance to the trial courts. *See Commonwealth v. Hardcastle,* 519 Pa. 236, 242–43, 546 A.2d 1101, 1103–04 (1988)(race-based strikes violate equal protection clause); *Commonwealth v. Jones,* 542 Pa. 464, 519, 668 A.2d 491, 518 (1995)(gender-based strikes violate equal protection clause)(citing *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994)). I would recommend that this Court provide the same type of guidance to the trial courts with respect to the cognizability of ethnic groups, rather than impose upon them the burden of determining ethnic groups' cognizability on a case-by-case basis.

4. Adopting the cognizability test set out in *Batson v. Kentucky,* Italian–Americans would be considered a cognizable group if they are capable of being singled out for differential treatment. *Batson v. Kentucky,* 476 U.S. 79, 94, 106 S.Ct. 1712, 1722, 90 L.Ed.2d 69, 86 (1986). The Third Circuit Court of Appeals has identified several other criterion for determining the cognizability of a group for *Batson* purposes which do not violate the principles of that decision. *United States v. DiPasquale,*

test enunciated by the Majority, I disagree with the Majority's conclusion that no error on the part of the trial court has been demonstrated. To the contrary, the record reflects that even though the trial court was uncertain as to whether Italian Americans were a cognizable group for *Batson* purposes, it was clearly concerned about several of the peremptory strikes used by the prosecution, and took pains to preserve the record with respect to the strikes of Vincent Giorgi and Susan Bratolla. Arguably, this uncertainty explains the trial court's refusal to strike the jury panel because of the prosecution's use of peremptory challenges to strike jurors of Italian–American descent.

During voir dire, the prosecution used a peremptory challenge to strike Vincent Giorgi. There is no question that Mr. Giorgi was of Italian descent. During voir dire by the court, Mr. Giorgi steadfastly maintained that evidence which might link Appellant or one or more of the witnesses with organized crime would not affect his ability to be fair and impartial. Following the strike the trial court asked the prosecutor to provide a neutral explanation for the strike, in accord with the strictures of *Batson* and its progeny. The prosecutor replied that he thought he saw "fear in [Giorgi's] demeanor and his voice when organized crime was mentioned and that in conjunction with his Italian background led me to believe he would not be a juror suitable with this case." The defense then moved to strike the panel, and the court denied the motion.

The prosecution also used a peremptory challenge to strike Susan Bratolla, whom the Commonwealth conceded was of Italian descent. During voir dire Ms. Bratolla repeatedly stated that evidence linking Appellant to organized crime

864 F.2d 271, 277 (3rd Cir.1988). These include common backgrounds, ideas, group loyalties and interests. *Id.* Based on the standard set out in *Batson*, and further detailed in *DiPasquale*, I believe that Italian–Americans, as well as any and every discernable ethnic group in America today are cognizable for *Batson* challenge purposes. Every ethnic group is capable of being singled out for differential treatment in one way or another, and every ethnic group shares a common background and some ideas, loyalties and interests linked to a single culture; those commonalities are part of what makes up an ethnic group.

would not affect her ability to be fair and impartial. When the trial court requested a neutral explanation for the strike the prosecutor indicated that Ms. Bratolla lived in "South Philadelphia in an area over which the mob will speak and I think she's subject to intimidation so in an abundance of caution I'm striking her." The trial court did not accept the prosecutor's explanation and was not going to strike her. The prosecutor interjected that refusing the strike would prejudice the Commonwealth because Ms. Bratolla had already overheard his attempt to strike her. Only in the face of this apparent prejudice did the trial court relent and permit the strike. Thus, what the prosecution could not get through the front door it forced through the back.

Following Ms. Bratolla's voir dire the trial court refused to allow the prosecution to use peremptory strikes against any individuals of Italian descent unless the strikes were first discussed at sidebar—out of the hearing of any potential juror. The defense then again moved to strike the panel, and the trial court responded that it would not, primarily because it was unsure whether Italian–Americans constituted a cognizable group for *Batson* purposes.

Contrary to the findings of the Majority, the facts of record indicate the trial court did not simply accept the prosecution's explanations for striking Italian–American venirepersons. Instead, the trial court repeatedly voiced its frustration with the prosecutor's tactics and in fact, created a detailed record regarding the prosecution's use of its peremptory strikes against Italian–Americans. The Majority prospectively puts the issue of cognizability in the hands of the trial court while ignoring the fact that the trial court in the instant case did not have the benefit of a determination of ethnicity as a cognizable group.[5]

5. There is little question that granting ethnic groups cognizable status under *Batson* will pose difficult problems for our courts to face. Over twelve years ago, when the United States Supreme Court decided *Batson*, Justice White correctly predicted that "much litigation [would] be required to spell out the contours of the Court's holding today." *Batson*, 476 U.S. at 102, 106 S.Ct. at 1726, 90 L.Ed.2d at 91 (White, J., concurring). The people of this Nation share a wealth of ancestries

In light of the above, I respectfully dissent from the Majority opinion and would affirm the Superior Court's reversal of Appellant's conviction, remanding the case for a new trial wherein the prosecution would not be permitted to strike jurors on the impermissible grounds of their ethnicity.

unmatched anywhere in the world, making precise determinations as to any individual's particular ethnic background an extremely difficult task. In his Concurring Opinion, Justice Castille observes that a quagmire of trials within trials might arise if ethnic groups are given cognizable group status for *Batson* purposes. While I agree with his observation, I cannot agree with his personal conviction that ethnic groups should not be afforded the protections of the Equal Protection Clause in jury selection. Difficulty in application of the protection for ethnic groups is a formidable obstacle. This obstacle, however, cannot extinguish the right of qualified jurors and indeed all Americans to a justice system devoid of discrimination in violation of the Constitution. Perhaps our system of justice would be best served by elimination of peremptory challenges altogether, as Justice Zappalla suggests in his Concurring Opinion. However, until and unless such a result is reached, we must do justice unto the people on whose confidence our judicial system depends.