817 A.2d 1033

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Francis Bauer HARRIS, Appellant.**

**No. 271 Capital Appeal Docket.**

Supreme Court of Pennsylvania.

Argued May 2, 2000.

Decided Nov. 20, 2002.

Reargument Denied March 20, 2003.

490

492

498

William W. Boyd, Thelia Jean Eaby, Lancaster, for F. Harris.

Craig W. Stedman, Lancaster, for the Com. of PA.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION*

Justice CASTILLE.

This is a direct appeal from the sentence of death imposed on appellant by the Court of Common Pleas of Lancaster County.[1] On October 4, 1997, following a jury trial, appellant was convicted of first-degree murder.[2] After a penalty hearing, the jury found one aggravating circumstance and no mitigating circumstances and, therefore, returned a sentenc-

1. 42 Pa.C.S. § 9711(h)(1).
2. 18 Pa.C.S. § 2502(a).

ing verdict of death.[3] Post-verdict motions were filed and denied and the trial court formally imposed the death penalty. On appeal, appellant raises six claims, many of which have multiple subparts. For the reasons that follow, we affirm the judgment of sentence.

Although appellant has not specifically challenged the sufficiency of the evidence, we begin, as we do in all death penalty direct appeals, by performing our self-imposed obligation to review the evidence underlying the first-degree murder conviction. *See Commonwealth v. Spotz*, 563 Pa. 269, 759 A.2d 1280, 1283 (2000). In reviewing the sufficiency of the evidence, we must determine whether the evidence, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, supports the jury's finding of all of the elements of the offense beyond a reasonable doubt. *Id.; Commonwealth v. Rhodes*, 510 Pa. 537, 510 A.2d 1217, 1218 (1986).

Evidence is sufficient to sustain a conviction for first-degree murder where the Commonwealth establishes that the defendant acted with a specific intent to kill; that a human being was unlawfully killed; that the defendant is responsible for the killing; and that the killing was committed with premeditation or deliberation. *See* 18 Pa.C.S. § 2502(d); *Spotz; Commonwealth v. Mitchell*, 528 Pa. 546, 599 A.2d 624, 626 (1991). A specific intent to kill may be proven by circumstantial evidence; and it may be inferred from the defendant's use of a deadly weapon upon a vital part of the victim's body. *Spotz; Commonwealth v. Bond*, 539 Pa. 299, 652 A.2d 308, 311 (1995).

The evidence adduced at trial showed that: On August 1, 1995, Daryl Martin intervened in an argument between appellant and appellant's former girlfriend, Maxine Snook, at the Pipeline Bar in Lancaster, Pennsylvania. Appellant beat Mar-

---

**3.** The aggravating circumstance found by the jury was that the victim was a prosecution witness to a felony committed by appellant and was killed for the purpose of preventing his testimony against appellant in any grand jury or criminal proceeding involving such offense. *See* 42 Pa.C.S. § 9711(d)(5).

tin severely and, as a result, was charged with aggravated assault. Appellant's trial for aggravated assault was sched-' uled for November 1996. Prior to that time, appellant obtained the addresses from police reports of several of the witnesses against him, including Martin. Appellant instructed his then-girlfriend, Kimberly Kistler, to confirm that Martin lived at the address that appellant had obtained. Kistler did so.

On the weekend of November 2–3, 1996, appellant, who lived in East Rutherford, New Jersey, visited Kistler at her home in Elizabethtown, Pennsylvania. At appellant's request, Kistler called Martin on November 3rd and lured him into what proved to be a fatal encounter. Kistler identified herself to Martin as a woman named "Patty" from Ohio, and claimed that she had met Martin on a prior occasion when he was drunk. She arranged to meet Martin for drinks at the Tobias S. Frogg restaurant in Lancaster between 7:30 and 8:00 that evening.

Appellant and Kistler arrived at the Tobias S. Frogg well before the designated hour and, after surveying the area, waited in their car for Martin. After Martin arrived and entered the restaurant, appellant slashed the left front tire of Martin's car, and then he and Kistler lay in wait for Martin in a nearby parking lot. At approximately 8:45 p.m., Martin left the restaurant, entered his car and attempted to drive away. Upon discovering that his vehicle had a flat tire, Martin pulled into the parking lot of an abandoned Dunkin' Donuts. He then walked back to the restaurant and called his brother for assistance from the restaurant's pay phone. When Martin returned to the Dunkin' Donuts lot, however, appellant ambushed him with a knife, slashing Martin's throat with such force as to leave a wound over eight inches in length and three inches deep, killing him.

Kistler was the Commonwealth's key witness at trial. She testified that, after Martin had entered the Dunkin' Donuts lot, appellant drove his truck behind the lot, exited the vehicle, and instructed Kistler to drive around the neighborhood for a few minutes before returning to pick him up. After circling

the neighborhood for approximately five minutes, Kistler returned to the lot and saw appellant running towards the car. When appellant entered the vehicle, he was shaking, growling and breathing heavily. He was no longer wearing the plaid jacket that he had been wearing when he exited the vehicle earlier. Kistler further testified that, as they were driving on Route 741 near the Route 30 bypass, appellant threw his black Fila sneakers out of the car window.

Kistler stated that she and appellant arrived back at her house at 9:15 p.m., whereupon appellant began to construct an alibi. Appellant instructed Kistler to call his brother, Russell, on Russell's cell phone and tell Russell to call one John Russo and then use appellant's parents' phone to call Kistler back. Appellant also told Kistler to tell the police that he had left Elizabethtown between 6:00 and 6:30 p.m. and had arrived home in New Jersey between 9:00 and 9:30 p.m. Kistler further testified that, after appellant left to return to New Jersey, she indeed called Russell Harris on his cell phone and instructed him to call John Russo. Then, Kistler called Russell back at appellants' parents' home phone number and instructed him to call her back, which he did.

At trial, Kistler identified the pair of bloodstained, size 13, black Fila sneakers later found by police along Route 741 near the Route 30 bypass as the shoes that appellant had been wearing on the night of the murder. She also identified a plaid jacket found near the crime scene as the jacket appellant had been wearing on the night of the murder. The jacket was stained with blood that proved to be consistent with the blood type and DNA of Martin.

Paul Janowski, the former owner of the Pipeline Bar, and Sherry Henry, an acquaintance of appellant's from the Pipeline Bar, both identified the plaid jacket as appellant's. Maxine Snook identified the bloodstained knife police found near the crime scene, which proved to be consistent with an object inflicting the type of wounds inflicted on Martin, as being similar to a knife that she had seen appellant carrying prior to the murder. Snook further identified the bloodstained Fila sneakers as similar to the sneakers that appellant had worn to

his preliminary hearing in his assault case. Mark Dodge, a long-time friend of appellant's, also identified appellant's sneakers.

Detective John Ator of the Lancaster County Police Department testified that he questioned appellant about the murder of Daryl Martin. Appellant told Ator that he had gone to visit Kistler in Lancaster on the weekend of November 2–3, 1996, but that he had left Lancaster on Sunday evening at 6:00 p.m. Appellant claimed that he had arrived in East Rutherford, New Jersey, at 9:30 p.m. and, subsequently, left a message on John Russo's answering machine. Then, he called Kistler to tell her that he had made it home safely. Appellant told Ator that he went to look for Russo at the Mardi Gras bar in Lyndhurst, New Jersey. He claimed that he arrived at the Mardi Gras at 10:00 p.m. and asked the owner if Russo was around.

Several witnesses contradicted appellant's fabricated claim of alibi. John Russo testified that there was no message on his answering machine from appellant on November 3, 1996, but that he did receive a message from appellant's brother Russell on that date. Martin Nowinski, the owner of the Mardi Gras bar, testified that he did not remember appellant coming into the bar and speaking with him on November 3, 1996. Russell Harris testified that, on November 3, 1996, Kimberly Kistler called him on his cell phone at 9:15 or 9:30 p.m. and asked him to call John Russo. Harris testified that he made the call and left a message for Russo telling him to call Kistler. Two minutes later, Harris called Kistler back to tell her that Russo was not home. Harris further testified that he was living with appellant at their parents' house on November 3 and that he did not see appellant at all on that day. Lurline Harris, appellant's mother, testified that on November 3, 1996, she had been downstairs in her home until 11:00 p.m. and also did not see appellant at all that day. At approximately 11:30 that evening, however, when Mrs. Harris was in bed, she heard appellant say, "Hi, ma" from outside her bedroom door.

Deborah Calhoun, a forensic pathologist, testified that two hairs retrieved from the plaid jacket found at the scene of the murder were consistent with appellant's hair, two other hairs came from Kistler, and a fifth hair was consistent with hair from Daryl Martin. Calhoun further testified that two hairs found in the truck driven by appellant on the night of the murder could have come from Martin. Finally, Calhoun testified that blood found on the knife and the plaid jacket was consistent with Martin's blood.

The Commonwealth also produced telephone records indicating that a pre-paid phone card was used to make a phone call to Kistler's home from a pay phone in Bethel, Pennsylvania at 10:03 p.m. on November 3, 1996. Bethel is 38 miles from Elizabethtown and a two-hour drive from East Rutherford. The same card was used to call John Russo from appellant's workplace, to make a call to Kistler's home from appellant's home, and to make a call from Kistler's home during a period when appellant was in Elizabethtown. Kistler testified that appellant had bought two pre-paid phone cards on the night of the murder. Thus, any alibi was effectively eliminated.

The foregoing facts amply support the first-degree murder verdict. Appellant set out to locate and kill Daryl Martin, who was the victim and a material witness against him in a pending aggravated assault prosecution about to go to trial; after immobilizing Martin's car and laying in wait for him, appellant slit Martin's throat; and appellant's elaborately arranged alibi was contradicted by, *inter alia*, Kistler's testimony, telephone records, and the testimony of his own family and friends. The jurors were justified in finding that appellant was the killer, that he acted with specific intent, and that the murder was premeditated. We now turn to appellant's claims of error.

Appellant first claims that the lower court abused its discretion in finding that the Commonwealth's exercise of a peremptory challenge to strike the only African American prospective juror did not violate *Batson v. Kentucky*, 476 U.S. 79, 106

S.Ct. 1712, 90 L.Ed.2d 69 (1986), and its progeny. Appellant begins by noting that, although he is of German/Polynesian/Hawaiian ancestry, he was adopted and raised by an African American family. He claims that the juror in question was struck solely because of her race and that the Commonwealth's proffered race-neutral reasons for striking her, which the trial court explicitly credited, were pretextual. The Commonwealth responds that appellant failed to prove a *prima facie* case under *Batson* and that, in any event, the trial court properly found that the prosecutor's articulated reasons for the strike were race-neutral and did not err in crediting the prosecutor's race-neutral explanation.

*Batson* and its progeny restrict, through the Fourteenth Amendment's equal protection clause, the exercise of peremptory challenges based on race in state trials in an attempt to eliminate purposeful racial discrimination in the jury selection process. The equal protection claim arising from peremptory challenges is the fact, explicitly recognized by the U.S. Supreme Court, that "peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" *Batson*, 476 U.S. at 96, 106 S.Ct. 1712. *Batson* set forth a three-part test for examining a criminal defendant's claim that a prosecutor exercised peremptory challenges in a racially discriminatory manner: first, the defendant must make a *prima facie* showing that the circumstances give rise to an inference that the prosecutor struck one or more prospective jurors on account of race; second, if the *prima facie* showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror(s) at issue; and third, the trial court must then make the ultimate determination of whether the defense has carried its burden of proving purposeful discrimination. *Commonwealth v. Basemore*, 560 Pa. 258, 744 A.2d 717, 728 (2000); *see also Hernandez v. New York*, 500 U.S. 352, 358–59, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion); *Batson*, 476 U.S. at 97, 106 S.Ct. 1712.

To establish a *prima facie* case of purposeful discrimination under the initial *Batson* test, the defendant had to show that he was a member of a cognizable racial group, that the prosecutor exercised a peremptory challenge or challenges to remove from the venire members of the defendant's race; and that other relevant circumstances combined to raise an inference that the prosecutor removed the juror(s) for racial reasons. *Batson*, 476 U.S. at 96, 106 S.Ct. 1712; *Basemore*, 744 A.2d at 728–29. In a case decided after *Batson*, however, the Supreme Court modified *Batson*'s required elements for a *prima facie* case, holding that, while racial identity between the excluded juror(s) and the defendant might help to establish a *Batson* violation, it was not a necessary requirement. *Powers v. Ohio*, 499 U.S. 400, 415–16, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).[4] This is so, the *Powers* Court reasoned, because the harm *Batson* seeks to avoid is not only a trial where members of the defendant's own race have been excluded from the jury on account of their race, but also the harm to the prospective jurors and the community at large that results when citizens are denied participation in jury service based upon their race. *Id.; see also Commonwealth v. Thomas*, 552 Pa. 621, 717 A.2d 468, 475 (1998).[5]

The second prong of the *Batson* test, involving the prosecution's obligation to come forward with a race-neutral explanation of the challenges once a *prima facie* case is proven, "does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Rather, the issue at that stage " 'is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's

---

4. *Powers* is essential to appellant's claim, since appellant himself is not of the same "race" as the excluded juror. *See Commonwealth v. Tilley*, 566 Pa. 312, 780 A.2d 649, 652 (2001).

5. That *Batson* involves concerns beyond those of a criminal defendant himself is conclusively established by the fact that *Batson* has been extended to peremptory strikes exercised by a criminal defendant in jury selection. *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); *Commonwealth v. Rico*, 551 Pa. 526, 711 A.2d 990, 992 (1998) (plurality).

explanation, the reason offered will be deemed race neutral.' " *Id., quoting Hernandez,* 500 U.S. at 360, 111 S.Ct. 1859.

If a race-neutral explanation is tendered, the trial court must then proceed to the third prong of the test, *i.e.*, the ultimate determination of whether the opponent of the strike has carried his burden of proving purposeful discrimination. *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769. It is at this stage that the **persuasiveness** of the facially-neutral explanation proffered by the Commonwealth is relevant. *Id.* The trial court's finding as to discriminatory intent must of necessity be accorded great deference on appeal. This is so because the ultimate question of discriminatory intent involves an assessment of credibility. *Id.* at 769, 115 S.Ct. 1769; *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. 1712.

> In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

*Hernandez,* 500 U.S. at 365, 111 S.Ct. 1859 (citations omitted). Accordingly, the trial court's finding as to discriminatory intent may be overturned only if it was clearly erroneous. *See Hernandez,* 500 U.S. at 363–70, 111 S.Ct. 1859.[6]

In the case *sub judice*, the Commonwealth used a peremptory challenge to exclude prospective juror number 9 (hereinafter identified by her initials "E.C."), who proved to be the only African–American in the jury pool for this trial. Appellant immediately raised a *Batson* objection, noting that

---

**6.** Although the decision in *Hernandez* was by plurality, a six-justice majority of the Court agreed that a trial court's finding on the issue of discriminatory intent must be affirmed unless it is clearly erroneous. (Plurality Opinion of Kennedy, J., joined by Rehnquist, C.J., White, and Souter, JJ.; Concurring Opinion of O'Connor, J., joined by Scalia, J.). *See also Commonwealth v. Dinwiddie,* 529 Pa. 66, 601 A.2d 1216, 1222 n. 1 (1992) (Zappala, J. concurring).

the juror was black and that appellant's adoptive family also was black. The trial court then directed the prosecutor "to place on the record the reason and justification for the exercise of the challenge." After first noting that appellant was not himself black,[7] the prosecutor stated that, in his view, (1) the juror had difficulty following some of the questions; (2) the juror was more responsive to defense counsel's questioning than to the prosecutor's; (3) the juror had expressed concerns about imposing the death penalty in an appropriate case and, although she was rehabilitated by further questioning to the point that she might survive a challenge for cause, the prosecutor did not believe she would be able to overcome her concerns with the death penalty and be a fair capital juror; (4) the fact that defense counsel objected to a question posed by the prosecutor in front of the juror, and the court ruled on that objection favorably to appellant in front of the juror, hurt the prosecutor's credibility with the juror; and (5) the juror's body language, including averting her eyes when the prosecutor questioned her about her ability to return a sentence of death, corroborated the prosecutor's concern that the juror would not be able to return a verdict of death. Upon hearing this explanation, the trial court denied the *Batson* motion and excused the juror. N.T. 1434–37.

With respect to the Commonwealth's present argument that appellant failed to establish a *prima facie* case, we note that

7. Appellant seizes upon this comment, calling it a racial argument that corroborates the prosecutor's discriminatory intent. Brief for Appellant, 20. Appellant's argument, however, ignores the context in which the remark was made. In raising his *Batson* objection, appellant claimed that the prosecutor's action had to be deemed racially-based because the juror was the only black juror yet interviewed and [appellant's] family is black. N.T. 1435. The prosecutor's accurate notation that appellant himself was not black followed immediately upon this defense argument. Although racial identity between the defendant and the challenged juror is not **necessary** to a *Batson* claim according to *Powers*, the existence or non-existence of such racial identity may be **relevant** to it, as appellant himself obviously believed in invoking the race of his adoptive family in the first instance. The fact that the prospective juror was of a different race than appellant cannot justify the strike on its own, of course, but it was no less relevant to the question of the intention behind the strike than was the race of appellant's adoptive family.

the U.S. Supreme Court's plurality opinion in *Hernandez v. New York* suggested that, "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a *prima facie* showing becomes moot." 500 U.S. at 359, 111 S.Ct. 1859. Neither of the parties discusses this aspect of *Hernandez*; instead, both sides actively dispute whether a *prima facie* case was proven. Although a finding of mootness regarding the first prong of *Batson* where the prosecution provides the reasons for its strikes is not yet **required** by the U.S. Supreme Court, the *Hernandez* plurality's expression naturally gives us pause in determining the appropriate manner of approaching the *Batson* issue presented here. Since this Court is satisfied that the trial court did not err in its ultimate *Batson* determination, we will assume without deciding that a *prima facie* case of purposeful discrimination was indeed made out here, and turn, as the trial court did, to the question of whether appellant carried his ultimate burden of proving that the Commonwealth struck juror E.C. on account of her race.

 Appellant does not seriously contest the facial neutrality of the reasons for the strike proffered by the prosecutor, instead claiming that those reasons were merely pretextual.[8] In its opinion, the trial court noted that the prosecutor's principal basis for the peremptory strike was the juror's equivocation on the death penalty. It is well-established that equivocation respecting imposition of the death penalty constitutes a legitimate race-neutral reason for striking a juror in a capital case. *See Commonwealth v. Bronshtein*, 547 Pa. 460, 691 A.2d 907, 915 (1997), *cert. denied*, 522 U.S. 936, 118 S.Ct. 346, 139 L.Ed.2d 269 (1997); *Commonwealth v. Griffin*, 537 Pa. 447, 644 A.2d 1167, 1173 (1994). The trial court credited this explanation for the strike and deemed it "legitimate and

8. Although, as noted above, appellant argues that the prosecutor's notation that appellant himself was not black was a racial argument, he does not dispute that the prosecutor's overall explanation, on its face, was race-neutral.

race-neutral," noting that: "The Court heard the questioning of juror E.C. and the explanations of the Commonwealth and believes that the Commonwealth had a good faith basis to believe that juror E.C. may have [had] trouble imposing the death penalty." Trial Court op. at 11. The trial court also credited the prosecutor's additional reasons for striking the juror as valid and non-pretextual. *Id.* ("the Court finds all of the Commonwealth's proffered reasons to constitute credible additional reasons for the exercise of [the] peremptory challenge.").

Appellant takes issue with the trial court's credibility determination, arguing that the prosecutor's reasons for the strike were pretextual because other jurors, allegedly identically situated to juror E.C. except for their race, were deemed acceptable by the prosecutor. But appellant does not identify any juror acceptable to the Commonwealth who was similarly situated to juror E.C. as to all of the factors articulated by the prosecutor as relevant to his decision to strike. Instead, appellant focuses on the identified factors individually. Thus, he claims that the reasons advanced by the prosecutor were pretextual because: five jurors in addition to E.C. allegedly appeared to have difficulty understanding certain questions posed by the prosecutor (jurors 30, 52, 60, 29, and 23); four other jurors appeared to equivocate on the death penalty (jurors 35, 108, 80, and 29); one other juror heard the court allegedly "admonish" the prosecutor after a misleading question (juror 60); and the body language of two other jurors allegedly was similar to that of juror EC (jurors 108 and 29). (Appellant makes no argument concerning the fifth factor identified by the prosecutor, *i.e.,* that juror E.C. appeared to be more responsive to defense counsel than to the prosecutor.) Appellant's comparison of jurors with select characteristics does not establish that the strike here, which was based upon a combination of reasons, was pretextual. *See State v. Porter,* 326 N.C. 489, 391 S.E.2d 144, 152–53 (1990) (rejecting defendant's approach of "finding a single factor among the several articulated by the prosecutor as to each challenged prospective juror and matching it to a passed juror who exhibited that

same factor;" that approach "fails to address the factors as a totality which when considered together provide an image of a juror considered in the case undesirable by the State"). In any event, even viewing the factors individually, the trial court's finding that the strike here was not racially motivated was not clearly erroneous. For example, with respect to E.C.'s equivocation on her ability to return a sentence of death, it is clear that E.C. was not identically situated to jurors 35, 108, 80, and 29, as appellant argues. Before the individual *voir dire* of juror E.C., the trial court addressed general questions to her panel. E.C. responded affirmatively to the court's question whether, if a proper case for imposition of the death penalty were made out, the juror would still "have any moral, religious, or ethical beliefs which would prevent you from considering the imposition of the death penalty." N.T. 1254–55. As the trial court noted in its opinion, none of the jurors eventually seated in this case-which included the four jurors appellant cites as displaying the "same doubts and concerns" as juror E.C. in this regard-indicated that they had such a belief that would **prevent** them from imposing the death penalty. In addition, during the individual *voir dire* of those jurors, none of them expressed a moral, religious or ethical belief which would prevent them from returning a verdict of death. Trial Court op. at 9 n. 3. Even if it is assumed that the other jurors cited by appellant equivocated during individual questioning with respect to the death penalty, as appellant claims,[9] they did not do so against a background of affirmatively indicating that they had a moral, religious or ethical belief that would preclude them from returning a verdict of death. Although the trial court noted the importance of this material distinction in its opinion, appellant does not address it.

9. In point of fact, some of the jurors appellant cites did not at all equivocate in the fashion of E.C. For example, juror 35 stated without qualification that he could impose the death penalty in an appropriate case even though he personally believed it to be ineffective. N.T. 200. Similarly, juror 108 stated that she had no moral, ethical, religious, or other personal objections to the death penalty and, when asked whether she could return a verdict of death in an appropriate case, said, simply, Yes. N.T. 533.

Moreover, although the individual questioning of juror E.C. may have been sufficient to rehabilitate her from a challenge for **cause** based upon her beliefs respecting the death penalty, she continued to express reservations in individual *voir dire* about the death penalty. Thus, after the trial judge explained the operation of Pennsylvania law involving the death penalty, and asked E.C. if she could "impose the death penalty," E.C. responded, "Yeah, if it really—if they proved it like that, possibly, yes." N.T. 1419–21. In light of this record, the trial court plainly did not err in crediting the prosecutor's representation and concluding that the strike of E.C. was not racially motivated.

Appellant next claims that the trial court erred by admitting into evidence photocopies of two letters that he mailed to Ms. Kistler from prison. The letters were sent to Kistler at the address where she had resided with her mother. By the time the letters were delivered, however, Kistler was incarcerated. Kistler's mother turned the letters over to her son, Robin Mathias, who opened them and photocopied the contents and then returned them to his mother to forward to Kistler. Robin Mathias subsequently delivered his copies of the letters to the District Attorney's Office. Appellant, who did not move to suppress the copies of the letters pre-trial, now alleges that the admission of the copies violated his privacy rights under the Fourth Amendment of the United States Constitution and Article I, § 8 of the Pennsylvania Constitution.[10] This claim is meritless.

Strictly speaking, the admission of the copies of the letters at trial was not an event implicating the Fourth Amendment or Article I, § 8, since those provisions concern governmental "searches" and "seizures." Thus, appellant's constitutional objection can only concern the manner in which

10. Although appellant invokes both the Fourth Amendment and Article I, § 8, he does not argue that he has broader or different rights under the Pennsylvania Constitution than under the federal Constitution in this particular instance. Accordingly, for purposes of the decision here, we will assume that the analysis involved is identical under the two provisions.

the Commonwealth acquired the copies of the letters. In this regard, the controlling fact is that it was a non-government agent, Kistler's brother, who intercepted and copied the letters and then turned the copies over to the Commonwealth.

 The proscriptions of the Fourth Amendment and Article I, § 8, do not apply to searches and seizures conducted by private individuals. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); *Commonwealth v. Corley*, 507 Pa. 540, 491 A.2d 829 (1985). Thus, the *Corley* Court recognized:

> At the core of the reasoning underlying this refusal to extend application of the exclusionary rule to private searches is the concept of "state action", the understanding that the Fourth Amendment operates only in the context of the relationship between the citizen and the state. Although this Court has never ruled that the same result necessarily obtains under Article I, Section 8 of the Pennsylvania Constitution, the Superior Court has so held, *Commonwealth v. Dingfelt*, 227 Pa.Super. 380, 323 A.2d 145 (1974), and we have implicitly acknowledged the force of the argument, distinguishing cases in which we have applied the exclusionary rule by emphasizing the extensive police involvement in the search. *See e.g., Commonwealth v. Eshelman*, 477 Pa. 93, 383 A.2d 838 (1978).

491 A.2d at 831. *See United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (Fourth Amendment proscribes "only governmental action;" it is inapplicable to searches, even unreasonable ones, effected by private individual "not acting as an agent of the Government or with the participation or knowledge of any governmental official"). Here, as the trial court noted, there was no evidence that Mathias was acting as an agent of the Commonwealth. His uncontroverted testimony established that it was his idea alone to copy the letters and turn the copies over to the District Attorney. Moreover, the mere fact that the prosecution introduced those copies at trial did not change the private nature of the previous seizure of the letters themselves by

Mathias. *Commonwealth v. Hawkins*, 549 Pa. 352, 701 A.2d 492, 505 (1997) ("Individual acts do not become imbued with the character of governmental action merely because they are later relied upon and used by the government in furtherance of governmental objectives"); *Corley*, 491 A.2d at 832 ("The mere use by police and prosecutors of the results of an individual's actions does not serve to 'ratify' those actions as conduct of the state").

■ Appellant nevertheless argues that the copies of the letters should be deemed inadmissible because, even if the prosecution was lawfully "in possession of the letters, it did not give them the authority to search their contents." Brief for Appellant, 36.. The fundamental preliminary flaw in appellant's argument, of course, is that the prosecution did **not** read or search the actual letters themselves. Instead, Mathias provided **copies** of the letters, which he had made of his own accord. The Commonwealth conducted no search of the letters themselves.

*Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980) (plurality opinion), the case appellant cites in support of his claim that the Commonwealth unlawfully "searched" the privately-seized letters, does not support his claim. In *Walter*, employees of a private party to whom an interstate shipment of twelve sealed packages was mistakenly delivered opened the packages and discovered 871 boxes of 8–millimeter film. On the outside of the boxes were suggestive drawings and explicit descriptions of the contents. One employee opened one or two of the boxes and attempted, without success, to view the film by holding it up to the light. The packages were delivered to FBI agents, who screened them with a projector without first obtaining a warrant, and determined they were pornographic, which led to federal obscenity charges.

Although it is clear that the U.S. Supreme Court ultimately disapproved of the FBI screening of the films discovered by the private party in *Walter*, the absence of a majority opinion made its constitutional significance uncertain. The Court's later 6–3 decision in *Jacobsen*, however, makes clear the

Fourth Amendment proposition that governs cases such as this. The Court in *Jacobsen* stated that the standard that emerged from *Walter* is that "the additional invasions of . . . privacy by the government agent [following a private search] must be tested by the degree to which they exceeded the scope of the private search." 466 U.S. at 116, 104 S.Ct. 1652.[11] In *Jacobsen*, Federal Express employees opened a box that had been damaged by a forklift and found a closed ten-inch tube wrapped in newspaper. The employees cut open the tube and found several plastic bags containing white powder inside. By the time a federal drug agent was summoned, the employees had returned the plastic bags into the tube, and replaced the tube into the box, so that the agent apparently had to remove the tube from the box, and then the plastic bags from the tube. He then field-tested the powder, which proved to be cocaine.

Applying the test derived from *Walter*, the Supreme Court in *Jacobsen* approved the drug agent's actions against a Fourth Amendment challenge. Relevant to our inquiry here, the Court held that "the removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search." Accordingly, the Court held, the removal and inspection "infringed no legitimate expectation of privacy and was not a 'search' within the meaning of the Fourth Amendment." 466 U.S. at 120, 104 S.Ct. 1652 (footnote omitted).[12]

The Commonwealth's mere reading of the copies of the letters delivered to them by Mathias in this case was not an unlawful warrantless search under *Walter* and *Jacobsen*. In-

11. The *Jacobsen* Court stated that the two-Justice plurality and four-Justice dissent in *Walter* agreed on the appropriate analysis of a governmental search which follows on the heels of a private one, *i.e.*, that the legality of the governmental search must be tested by the scope of the antecedent private search, and disagreed only with respect to the proper characterization of the scope of the private search. 466 U.S. at 115–16, 104 S.Ct. 1652.

12. The Court separately analyzed and approved the field-testing of the substance. That aspect of the holding is not relevant here.

deed, far from exceeding the scope of the antecedent private search here, the reading of the copies of the letters was less intrusive than Mathias' conduct in opening the letters addressed to his sister and copying them. Moreover, the contents of the letters were immediately apparent to the viewer; reading copies of the letters, thus, did not involve the sort of separate, enhanced scrutiny that was deemed a separate search in *Walter*, where FBI agents employed a projector to view film that was not viewable to the naked eye.

Appellant next alleges that the trial court abused its discretion in. admitting into evidence five other letters that he wrote to Ms. Kistler between November 15, 1996, and April 5, 1997. All but the first of these letters were written in response to letters that Kistler had written to appellant. Kistler gave appellant's letters to her attorney and, with her consent, counsel delivered copies of the letters to the Commonwealth. Appellant alleges that Kistler's counsel "apparently" used the letters while negotiating with the Commonwealth concerning Kistler's own prosecution. Appellant further asserts that, at the time that Kistler wrote her letters, she may have been an " 'instrument' or agent of the prosecution." Appellant also claims that, to the extent Kistler was an agent of the prosecution, that was a fact that should have been disclosed to him, and the failure to do so rendered admission of his letters into evidence a violation of *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). This claim is meritless.

In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the U.S. Supreme Court held "that suppression by the prosecutor of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. In *Giglio*, the Court extended *Brady* to certain impeaching evidence, as it held that, "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule [of required *Brady* disclosure]." 405 U.S. at 154,

92 S.Ct. 763, *quoting Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

The first fatal flaw in appellant's argument is that, as the trial court noted, there is no evidence in the record, and appellant proffered none, to show that Kistler was acting as an agent of the Commonwealth as opposed to acting on her own volition when she wrote her letters to appellant. In fact, Kistler flatly denied that she wrote any of the letters "at the request of any police officer or any representative of the District Attorney's [O]ffice." N.T. 3209. The mere fact that Kistler gave a statement to the Commonwealth and ultimately cooperated with the prosecution at appellant's trial does not establish that she was acting as an agent of the Commonwealth. The second fatal flaw in the argument is that, even if this Court were to assume *arguendo* that Kistler was acting earlier as an agent of the Commonwealth when she wrote to appellant, *Giglio* would not command that the letters appellant wrote in response must be suppressed or excluded from evidence. Instead, *Giglio* and *Brady* would require, at most, disclosure by the Commonwealth of the fact of agency, so as to permit impeachment of the witness. Since appellant's claim that the letters themselves were wrongly admitted under *Giglio* is supported by no relevant authority, nor is it supported by the holding or reasoning of *Giglio*, the claim fails.

In another claim relating to the letters he wrote to Ms. Kistler, appellant asserts that the trial court erred by denying his objection to the admission of the letter he wrote on April 5, 1997, on the ground that its admission violated the attorney-client privilege. Appellant argues that his April 5 letter was responsive to a letter from Kistler soliciting advice because her lawyer had recently resigned. As a result of Kistler's letter, appellant claims, he solicited legal advice from his own counsel, the substance of which he relayed in his letter of April 5. Appellant argues that his letter to Kistler is shielded by the attorney/client privilege because it contained "trial strategy and confidential communications between a client and his counsel, basically at the behest of an agent of

the prosecution." Brief for Appellant, 46. Appellant cites no authority in support of his attorney-client privilege argument.

The attorney-client privilege is set forth in Section 5916 of the Judicial Code, as follows: "In a criminal proceeding counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client." 42 Pa.C.S. § 5916. The introduction of appellant's letter to Ms. Kistler does not implicate the privilege. The letter is not a communication between appellant and his attorney, but it is instead a communication between two non-lawyers. Furthermore, introduction of the letter at trial did not involve counsel testifying against appellant, nor did it involve appellant being compelled to disclose communications between his lawyer and himself. In addition, even assuming that appellant relayed advice provided him by his attorney in the letter, that advice lost its confidential nature once appellant elected to commit it to paper in his own words and share it with a third party.

In a lengthy and somewhat convoluted subordinate argument, appellant also claims that he was particularly harmed by the admission of all of the letters because it put him in a position where he would have had to waive his right against self-incrimination and testify in order to explain the letters. The burden on his right against self-incrimination was particularly weighty, appellant claims, because the prosecutor argued the meaning of the letters to the jury. We fail to see how the proper admission of evidence, and proper prosecutorial comment upon that admitted evidence, unconstitutionally burdens the right against self-incrimination. The admission of any damning evidence may put a defendant in the position of having to decide whether or not to testify in response. If appellant's theory were sound, it would preclude the admission of any evidence of guilt.[13]

13. Appellant's related argument that the prosecutor's comment on appellant's letters was a remark on his failure to testify at trial is meritless. Nothing in the prosecutor's remarks adverted to appellant's failure to testify, and the prosecutor's comment upon the meaning of

▆▆▆ In another convoluted argument, appellant alleges that the trial court erred in allowing the Commonwealth to "allow deceptive evidence to go uncorrected or unexplained." Appellant notes that, at Ms. Kistler's trial, the Commonwealth called Kistler's sister, Kathy Gehr as a witness, and that Gehr's testimony helped to establish Kistler's guilt. Pointing to Gehr's testimony at the subsequent trial, appellant alleges that there were "discrepancies" between Gehr's account at Kistler's trial and Kistler's account at appellant's trial with respect to Kistler's efforts to locate the victim two weeks prior to the meeting she arranged which ultimately led to this murder. Appellant argues that Gehr's subsequent testimony at Kistler's trial would have been useful to him in his cross-examination of Kistler at his trial. Appellant also argues that the Commonwealth took inconsistent positions as to Kistler's role in the crime: According to appellant, the Commonwealth minimized Kistler's role in the crime during his trial, but emphasized her role in her own trial, based in part upon the evidence from Gehr. These perceived discrepancies in the Commonwealth's position respecting Kistler lead appellant to allege that the Commonwealth's presentation of evidence at his trial was "deceptive." Appellant then accuses the Commonwealth of failing to take steps after the fact to correct the deception. Appellant also alleges that the Commonwealth failed to disclose Gehr's favorable "exculpatory" evidence to him. For these reasons, appellant claims that the Commonwealth violated *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (state may not present known false evidence or allow false evidence to go uncorrected), *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (similar), and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (state is obligated to disclose evidence favorable to defense).

▆▆▆ The trial court rejected appellant's claim, noting that (1) it credited Detective Savage's testimony that, at the time of appellant's trial, police did not know the specific whereabouts

appellant's words as related in the letters admitted into evidence is not the equivalent of a comment on his failure to testify.

of the Gehr family; (2) because Gehr's police statement was turned over to the defense before trial, appellant had its contents available to him to cross-examine Ms. Kistler and, thus, there was no violation of *Giglio*; and (3) Gehr's testimony, as revealed at Kistler's trial, did not constitute exculpatory evidence and its absence did not prejudice appellant under the test set forth in *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Finally, the court made the following finding:

> [T]here is nothing sinister in the fact that Kathy Gehr testified at Ms. Kistler's trial or in the fact that the Commonwealth located her and had her testify at Ms. Kistler's trial. Moreover, the portrayals of Ms. Kistler in the Commonwealth's closing in [appellant's] trial and in the Commonwealth's opening in Ms. Kistler's trial are not necessarily inconsistent. The Court finds that the Commonwealth did not "deliberately deceive" the Court and the jury.

Trial Court op. at 23.

We perceive no error in the trial court's ruling. The Commonwealth obviously had neither the ability nor the duty to disclose Ms. Gehr's **subsequent** testimony. Nor was the Commonwealth under a duty to call Gehr to impeach Ms. Kistler, its own witness, at appellant's trial. Furthermore, the Commonwealth disclosed Gehr's police statement to appellant and, in point of fact, appellant's counsel employed that statement to impeach Kistler's credibility. Ms. Gehr was equally available to the defense as to the prosecution; if appellant thought that Gehr's testimony might be helpful to him, it was incumbent upon him, and not the Commonwealth, to contact her and call her as a witness.

The notion that the Commonwealth took positions at the two trials that were so divergent as to warrant a conclusion that the prosecutor in appellant's trial presented false or deceptive evidence is, as the trial court found, meritless. The Commonwealth never claimed at appellant's trial that Kistler was uninvolved in this murder. To the contrary, during summation, the Commonwealth noted for the jury that Kistler

"told you how she helped kill" Daryl Martin. At appellant's trial, the Commonwealth argued that appellant was the person who actually committed the murder. At Kistler's trial, the Commonwealth did not argue that she had physically killed Martin; it argued, instead, that Kistler was guilty of murder in the third degree because she set up Martin so that appellant could kill him. This is entirely consistent with the position that the Commonwealth took at appellant's trial. Moreover, to the extent that the Commonwealth argued that Kistler's implication of appellant was believable, but that her own attempt to minimize her role in the killing at her own trial should be rejected, this does not amount to the Commonwealth presenting false evidence. These discrepancies, to the extent they may be characterized as discrepancies at all, were a function of Kistler's different status in the two trials: *i.e.*, as an accuser of a cohort in one trial, and as the principal defendant in the next. The matters that appellant now identifies as affecting Kistler's credibility at his trial were issues he properly could elicit at trial and argue to the jury. But these circumstances do not remotely prove misconduct or deceptive conduct on the part of the Commonwealth.

 Appellant's remaining claims concern the penalty phase of trial. First, appellant argues that the trial court erred in admitting victim impact testimony. He alleges that Act No. 1995–22(SS1), which amended 42 Pa.C.S. § 9711 to permit victim impact testimony, is unconstitutional under both the Federal and the Pennsylvania Constitutions. The challenged legislation provides that, at the sentencing hearing in a jury trial, "evidence concerning the victim and the impact that the death of the victim has had on the family of the victim is admissible." 42 Pa.C.S. § 9711(a)(2). The statute also requires the court to instruct the jury in a capital trial on the role victim impact evidence plays in deliberations on a capital penalty:

> The court shall instruct the jury that if it finds at least one aggravating circumstance and at least one mitigating circumstance, it shall consider, in weighing the aggravating and mitigating circumstances, any evidence presented about

the victim and about the impact of the murder on the victim's family. The court shall also instruct the jury on any other matter that may be just and proper under the circumstances.

*Id.* § 9711(c)(2).

In conformity with the statute, the Commonwealth presented very brief testimony at the penalty phase from Mr. Martin's mother, father and brother describing the impact of the murder upon them. Although appellant did not object to this testimony prior to trial or at the time of its admission, he subsequently moved to amend his pre-trial motion challenging the validity of the death penalty statute to include a challenge to Act 22, invoking this Court's capital case relaxed waiver rule. The trial court granted the motion to amend.

Initially, we note that this Court has recently upheld the constitutionality of Act 22 in the face of multiple challenges brought under both the Pennsylvania and federal Constitutions. *Commonwealth v. Means*, 565 Pa. 309, 773 A.2d 143 (2001) (plurality opinion); *see also Commonwealth v. Natividad*, 565 Pa. 348, 773 A.2d 167 (2001) (plurality opinion) (applying *Means*). *Accord, Commonwealth v. Rice*, 568 Pa. 182, 795 A.2d 340, 351 (2002) (plurality opinion).[14] The Court in *Means* specifically rejected claims, identical to those forwarded by appellant here, that the victim impact legislation (1) violated Article III, § 12 of the Pennsylvania Constitution because it exceeded the scope of the governor's proclamation which called the special session of the General Assembly which produced the legislation; and (2) violated Article V, § 10 of the Pennsylvania Constitution because it infringed upon this Court's rulemaking authority. *See* 773 A.2d at 157 n. 8. Appellant also argues that the legislation is "violative of the

14. Although *Means* was a plurality opinion, a majority of the Court agreed that the victim impact provision was constitutional. *See* 773 A.2d at 159 (Saylor, J., concurring) (agreeing that "Pennsylvania's statutory scheme governing sentencing determinations in capital cases, as presently amended to allow for the admission of victim impact evidence, does not violate constitutional precepts"). *Accord Rice*, 795 A.2d at 363–64 (Nigro, J., concurring) (recognizing *stare decisis* effect of decision in *Means*).

due process, equal protection and cruel and unusual punishment clauses" of the Pennsylvania and Federal Constitutions. Brief for Appellant, 75–82. In developing this argument, appellant relies very heavily upon the trial court decision and opinion which this Court ultimately reversed in *Means*. These challenges also were rejected in *Means*. Thus, appellant's constitutional challenges to the legislation fail.

■■■ Appellant's claim fails for the additional reason that, in light of the court's charge to the jury and the jury's own findings respecting the proffered aggravating and mitigating circumstances, there is no reason to believe that appellant was prejudiced by the victim impact evidence. Consistently with § 9711(c)(2), the jury here was instructed on three separate occasions that they were to consider the victim impact evidence only if it found at least one aggravating and one mitigating circumstance and was then engaged in the process of weighing those countervailing circumstances. The jury ultimately found the existence of one aggravating circumstance, but did not find any of the proffered mitigating circumstances. Under the charge issued by the court, since the jury did not find the factual predicate that would have triggered a consideration of the victim impact evidence, it must be deemed not to have considered it. It is a settled principle, of course, that the jury is presumed to have followed the trial court's instructions on the law. *E.g. Commonwealth v. Richter*, 551 Pa. 507, 711 A.2d 464, 467 (1998).[15] Accordingly, appellant's victim impact evidence claim is meritless.

■■ Subsumed within appellant's claim that Act 22 is unconstitutional is a distinct and very different argument that the trial court erred in sustaining on grounds of irrelevance the Commonwealth's objection to his attempt to introduce testimony from his family members about how appellant's

15. Appellant asserts that [t]he fact that the jury did not find any mitigating circumstances after hearing the victim impact testimony is a possible indicator that the victim impact evidence colored the jury's consideration of mitigating factors. Brief of Appellant at 85. But this is nothing more than speculation. Such speculation is no basis for concluding that the jury disregarded its instructions.

crime had an impact on them. Brief for Appellant, 83–84. Appellant argues that such evidence would have been a "precursor to a mercy appeal." He also argues that the trial court's exclusionary ruling was contrary to his right under *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) to have the jury consider any relevant mitigation evidence. The Commonwealth argues that the evidence was irrelevant and, thus, was properly excluded.

Appellant's reliance upon *Skipper* is misplaced. In that case, the U.S. Supreme Court held that it was error for the trial court to preclude testimony that the defendant had made a good adjustment to prison life in the time between his arrest and trial. The Court explained that, "in capital cases, the sentencer [may] not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Skipper,* 476 U.S. at 4, 106 S.Ct. 1669 (citations omitted). In the instant case, appellant, whose family members were permitted to testify at length about his character and his difficult upbringing since this was relevant character evidence under 42 Pa.C.S. § 9711(e)(8), sought to have those family members also testify about how appellant's crime had affected them. This testimony concerning the impact on third parties had no bearing on appellant's character or record or the circumstances of the offense. Thus, its exclusion did not run afoul of *Skipper.*

 ██ Appellant's "execution impact" or "third party impact" testimony also was not relevant under Pennsylvania's capital sentencing statute. This type of evidence does not fall within any of the seven specific mitigating circumstances outlined in 42 Pa.C.S. § 9711(e). Nor does it fall within the "catchall" mitigating circumstance outlined in § 9711(e)(8), which encompasses, "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of the offense." The catchall mitigating circumstance obviously mirrors the requirements of *Skipper.* In holding that defense third party impact evidence is irrelevant

under Pennsylvania's capital sentencing scheme, we join a number of states which have considered this issue and have likewise concluded that third party impact evidence is irrelevant to the defendant's character or record or the circumstances of the crime. *See, e.g., People v. Sanders,* 11 Cal.4th 475, 46 Cal.Rptr.2d 751, 905 P.2d 420, 458–59 (1996), *cert. denied,* 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 66 (1996); *Burns v. State,* 699 So.2d 646, 654 (Fla.1997), *cert. denied,* 522 U.S. 1121, 118 S.Ct. 1063, 140 L.Ed.2d 123 (1998); *State v. Loftin,* 146 N.J. 295, 680 A.2d 677, 712–13 (1996); *State v. Stenson,* 132 Wash.2d 668, 940 P.2d 1239, 1278–1282 (1997), *cert. denied,* 523 U.S. 1008, 118 S.Ct. 1193, 140 L.Ed.2d 323 (1998).[16]

Appellant next argues that the trial court erred in refusing to direct the jury to find as a mitigating circumstance that he was under the influence of extreme mental or emotional disturbance at the time of the offense. *See* 42 Pa.C.S. § 9711(e)(2). During the penalty phase, appellant called Dr. Vincent Berger, a forensic psychologist, who testified that appellant may have been under the influence of an extreme mental or emotional disturbance at the time of the murder. Appellant asserts that, because Dr. Berger's opinion testimony was not rebutted by affirmative Commonwealth evidence on this subject, he was entitled to a directed verdict on the existence of this mitigating circumstance. The Commonwealth responds that the question of the presence of a particular mitigating circumstance falls within the province of the jury, which is free to either accept or reject evidence, including opinion evidence from expert witnesses.

As a general matter, once an expert is qualified to testify, the weight to be given his testimony is a matter for the jury. *Commonwealth v. Henry,* 524 Pa. 135, 569 A.2d 929, 934

---

**16.** A question could be raised whether this type of evidence is in actuality aggravating evidence as opposed to mitigating evidence. A death penalty imposed upon an individual may indeed dramatically affect the person's family, but it is still another consequence of the individual's voluntary act of murder as opposed to the act of being murdered. It would be a strange proposition to allow such "execution impact" evidence to be introduced as mitigation for the act of murder.

(1990) (citations omitted), *cert. denied,* 499 U.S. 931, 111 S.Ct. 1338, 113 L.Ed.2d 269 (1991). In *Commonwealth v. Breakiron,* 524 Pa. 282, 571 A.2d 1035 (1990), this Court held that the question of the existence of a proffered mitigating circumstance is for the jury. In that case in which the jury found no mitigating circumstances, the appellant claimed on appeal that the jury should have found as mitigating circumstances that he was under extreme mental or emotional disturbance, his age (twenty-five), and "other evidence of mitigation." This Court rejected the claim, noting that: "It is axiomatic that once a jury has been properly instructed on the nature of aggravating and mitigating circumstances as defined in the statute, as well as on the statutory scheme for balancing one against the other, it is not for reviewing courts to usurp the jury function and to substitute their judgment for that of the jury." *Id.* at 1043. In the case *sub judice,* because directing a verdict on the existence of this mitigating circumstance would have usurped the jury's function, the trial court did not err.[17] Furthermore, Dr. Berger, in fact, did not testify to a reasonable degree of medical certainty that appellant committed the murder while under the influence of an extreme mental or emotional disturbance. Rather, the doctor merely stated that appellant may have acted under the influence of an extreme mental or emotional disturbance. Given this equivocation, it would have been particularly inappropriate for the court to instruct the jury that it must conclude that appellant had acted under the influence of an extreme mental or emotional disturbance when he murdered Martin.

Next, appellant argues that the trial court erred in permitting the Commonwealth "to attempt to negate a mitigating circumstance (remorse for the crime)" during its cross-examination of Dr. Berger, where appellant did not pursue that mitigating circumstance. By allowing the Commonwealth to imply that appellant did not feel remorse, an implication he

---

17. We note that this is not a circumstance where the mitigating circumstance was presented to the jury by stipulation. In such a circumstance, "the jury is required by law to find that mitigating factor." *Commonwealth v. Rizzuto,* 566 Pa. 40, 777 A.2d 1069, 1089 (2001).

could only negate by testifying, appellant argues, the trial court also burdened his right not to testify. Brief for Appellant, 94. The Commonwealth responds that its examination of Dr. Berger with respect to appellant's lack of remorse was not designed to negate an unpursued mitigating circumstance. Instead, the Commonwealth notes, its brief cross-examination of Dr. Berger on this point was designed to impeach his credibility and his conclusion that appellant suffered from severe emotional problems and a detachment/attachment disorder by showing that appellant merely had an antisocial personality disorder. The Commonwealth further notes that Dr. Berger agreed with the prosecutor that a lack of remorse is consistent with a diagnosis of antisocial personality disorder and, thus, it was appropriate to question him concerning whether appellant in fact exhibited that conduct in order to test the doctor's overall diagnosis.

The record reveals that, on cross-examination, the prosecutor asked Dr. Berger whether appellant was capable of remorse. Dr. Berger answered in the affirmative. The prosecutor then asked whether a lack of remorse is one of the factors that are consistent with an antisocial personal disorder diagnosis, and Dr. Berger testified that it is, but stated that he did not believe that appellant had the disorder. Subsequently, the prosecutor attempted to impeach Dr. Berger with the Diagnostic and Statistics Manual (DSM IV), which lists the characteristics of different mental disorders and is used by professionals in the field. The court allowed cross-examination on this subject provided that the prosecutor did not go through the characteristics of all of the different mental disorders. Later in the cross-examination, Dr. Berger reasserted that, in his opinion, appellant was capable of remorse. The prosecutor asked Dr. Berger whether he would agree that there was no remorse for the victim expressed in the letters that appellant had written to Ms. Kistler (which were in evidence). Dr. Berger stated that he could not remember reading any expressions of remorse in the letters but added that, since appellant did not admit to killing the victim, "there couldn't be anything where he expressed remorse for it." Dr.

Berger also stated that he believed appellant was capable of remorse but had not expressed remorse to him because Dr. Berger had never asked him about it. At that point, the prosecutor inquired whether Dr. Berger agreed that some of the letters written by appellant seemed to contain evidence of scheming and requests for Ms. Kistler to recant her statement.[18] Defense counsel objected on the grounds that the question was based upon the prosecutor's interpretation. The objection was sustained and defense counsel requested a mistrial on the grounds that based on the prosecutor's improper question "injecting something that is not in this case." The mistrial request was denied.

It is settled that the trial court "has broad discretion over the scope of cross-examination, and its rulings in this area will not be reversed absent an abuse of that discretion." *Commonwealth v. Rizzuto,* 566 Pa. 40, 777 A.2d 1069, 1081(2001). In rejecting appellant's claim of error with respect to the Commonwealth's cross-examination of Dr. Berger, the trial court noted that the purpose of this examination was not to prove that appellant lacked remorse, but to impeach the doctor's expert opinion:

It is clear to this Court after a review of the record that the prosecutor was focused on one diagnosis, the antisocial personality disorder, and was using the DSM–IV to attempt to show that [appellant] did in fact exhibit numerous characteristics consistent with that disorder in an effort to impeach Dr. Berger's credibility and his ultimate conclusion. Under the DSM–IV, "lack of remorse" is one of seven characteristics, at least three of which are needed to conclude that an individual suffers from antisocial personality disorder. The prosecutor's questions to Dr. Berger concerning remorse were an effort to offer an alternative diagnosis and to show that [appellant] did indeed exhibit many of the seven characteristics of an antisocial personali-

18. The Commonwealth notes that this questioning was designed to inquire into other characteristics that are relevant to a diagnosis of antisocial personality disorder, as described in the DSM IV, but that the court's ruling put an end to this effort and thereby hampered the Commonwealth's ability to impeach Dr. Berger.

ty, although Dr. Berger said that [appellant] did not have this disorder. The ultimate purpose of the line of questioning was not to establish whether [appellant] was remorseful; rather, this portion of the cross-examination of Dr. Berger was one part of the Commonwealth's effort to impeach the defense expert witness. The Court believes that the Commonwealth had a good faith basis to pursue the line of questioning it did concerning remorse in the letters and that the questioning was not a comment on [appellant's] decision to exercise his constitutional right to remain silent.

Trial Court op. at 20.

■ We see no error in the trial court's ruling. The purpose for which this point was pursued is essential to assessing its propriety. The questions concerning whether appellant was capable of remorse were not aimed at rebutting a mitigating circumstance or suggesting an aggravating circumstance. Rather, their purpose was to impeach Dr. Berger's opinion that appellant suffered from a detachment/attachment disorder as opposed to antisocial personality disorder. Furthermore, the Commonwealth never argued to the jury that appellant lacked remorse, much less that his lack of remorse should be considered by the jury as an aggravating circumstance or as evidence rebutting an unpursued mitigating circumstance of remorsefulness. In addition, Dr. Berger's responses to the Commonwealth's questions were in no way prejudicial to appellant, since Dr. Berger opined on more than one occasion that he believed that appellant was capable of remorse. For these reasons, appellant's claim lacks merit.

■ Appellant last contends that the trial court erred in refusing his request to instruct the jurors, pursuant to *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), that there is no possibility of parole from a sentence of life imprisonment in Pennsylvania. "A *Simmons* instruction, detailing what a life sentence means in Pennsylvania, is required only if the prosecution makes the defendant's future dangerousness an issue in the case and the defendant

specifically requests such an instruction." *Commonwealth v. Spotz*, 563 Pa. 269, 759 A.2d 1280, 1291 (2000). *See also Commonwealth v. Smith*, 544 Pa. 219, 675 A.2d 1221, 1232 (1996).[19] Appellant concedes that the prosecutor never employed the words "future dangerousness" in arguing for a death sentence, but asserts that the prosecutor implied the point by allegedly suggesting to the jurors that "their own safety was at risk if [a]ppellant was ever released from prison." Brief for Appellant, 106.

The Commonwealth responds first by noting that appellant never requested a *Simmons* instruction premised upon the notion that the prosecutor's summation implied future dangerousness. The Commonwealth is correct. The record reveals that appellant requested a *Simmons*-type charge only **before** the penalty phase closing arguments and as a matter of right. The trial court properly denied the request since there is no entitlement to such an instruction as a matter of right. Appellant did not make the distinct argument that he now raises—*i.e.*, that he then became entitled to a *Simmons* charge premised upon the prosecutor's allegedly proceeding to actually argue future dangerousness. Accordingly, the *Simmons* claim fails. *Spotz*, 759 A.2d at 1291 & n. 14.

The claim also fails because, when viewed in context, it is clear that the prosecutor did not imply future dangerousness, much less that a verdict of death should be returned to prevent that danger. For example, the prosecutor's argument that this murder was an attack on the criminal justice system, of which the jurors themselves now were a part, did not imply that appellant was a danger to the jurors. Instead, the prosecutor was addressing the presence and purpose of the specifically charged aggravating circumstance, ultimately

19. A minority of Justices on this Court has consistently expressed the view that they would require a *Simmons* instruction in every case. *See, e.g., Commonwealth v. Robinson*, 554 Pa. 293, 721 A.2d 344 (1998) (Flaherty, C.J., dissenting; Zappala, J., concurring); *Commonwealth v. Clark*, 551 Pa. 258, 710 A.2d 31 (1998) (Zappala, J., concurring; Nigro, J., concurring).

found by the jury, that the victim was a prosecution witness to a felony committed by appellant and was killed for the purpose of preventing his testimony against appellant. The argument that appellant's murder of a victim/witness constituted an attack on the criminal justice system was fair and relevant argument for this purpose and did not suggest future dangerousness.

 Finally, having found no merit in the claims appellant raises, this Court must conduct a statutory review of the penalty of death. A careful review of the record, conducted pursuant to 42 Pa.C.S. § 9711(h)(3), convinces us that the sentence imposed was not the product of passion, prejudice or any other arbitrary factor. Furthermore, we find that the evidence was sufficient to establish the aggravating circumstance found by the jury, *i.e.*, that appellant murdered Daryl Martin to prevent Martin from testifying against him in a pending trial for aggravated assault. *Id.* § 9711(d)(5). Accordingly, we affirm the verdict and the sentence of death imposed upon appellant by the Court of Common Pleas of Lancaster County.[20]

Former Chief Justice FLAHERTY did not participate in the decision of this case.

Justice NIGRO files a concurring opinion in which Justice CAPPY joins.

Chief Justice ZAPPALA files a concurring and dissenting opinion.

Justice NIGRO concurring.

I join the majority's opinion in its entirety with the exception of the statements contained in footnote 16. As the majority correctly concludes, the trial court's exclusion of "third party impact" evidence in the instant case did not run afoul of *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669,

20. The Prothonotary of this Court is directed to transmit to the Governor's office a full and complete record of the trial, sentencing hearing, imposition of sentence and review by the Supreme Court pursuant to 42 Pa.C.S. § 9711(i).

90 L.Ed.2d 1 (1986), nor does this type of evidence fall within any of the eight specific mitigating circumstances outlined in 42 Pa.C.S. § 9711(e)(1)–(8). However, I cannot join the majority's *dicta* in footnote 16 because, in my estimation, it advances the proposition that "third party impact" evidence could actually be used as aggravating evidence to justify imposing the death penalty. It is clear to me, though, that such evidence has no place in our capital sentencing scheme as aggravating evidence, an observation affirmed by the fact that this evidence is not included within the statutory aggravating circumstances that permit the imposition of the death penalty in this Commonwealth. *See* 42 Pa.C.S. § 9711(d)(1)–(18). While I recognize that the thoughts expressed in footnote 16 are not part of the reasoning used in rejecting Appellant's substantive claim, for the foregoing reasons, I cannot join that portion of the majority opinion.

Justice CAPPY joins in this concurring opinion.

Chief Justice ZAPPALA, concurring and dissenting.

The majority holds that, while *victim* impact evidence is admissible in a capital sentencing hearing, evidence regarding the impact the crime had on the *defendant's* family is precluded. If one assumes that victim impact evidence is relevant to the jury's determination of whether the defendant should be executed for his offense, the logical extension of such a view is that evidence of the impact the defendant's execution would have on the defendant's family is equally pertinent and admissible evidence. Both types of evidence tend to establish the harm resulting from the loss of human life that has arisen from the criminal acts committed by the defendant. Will not the defendant's family be impacted and suffer a loss when the final sentence of death is imposed? Evidence of such impact is no less relevant than the victim impact evidence presented here by the Commonwealth.

My difficulty in this case stems from my unceasing disagreement with the controlling precedent of this Court holding that victim impact evidence is relevant and admissible. As I

noted in my dissenting opinion in *Commonwealth v. Means*, 565 Pa. 309, 773 A.2d 143 (2001) (Zappala, J., dissenting), and *Commonwealth v. Rice*, 568 Pa. 182, 795 A.2d 340 (2002) (Zappala, J., concurring and dissenting), the introduction of victim impact evidence unconstitutionally channels the jury's deliberations toward examining the life and attributes of the victim, rather than the criminal culpability of the defendant. I fully accept, however, the precedential value of this Court's decision in *Means* and believe that the natural extension of such a holding results in the admissibility of the evidence the defendant here sought to present.

The majority in the instant case holds that "execution impact" or "third party impact" testimony is inadmissible because "[t]his type of evidence does not fall within any of the seven specific mitigating circumstances outlined in 42 Pa.C.S. § 9711(e). Nor does it fall within the 'catchall' mitigating circumstance outlined in § 9711(e)(8), which encompasses, '[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of the offense.'" Majority opinion at 27. I agree that "third party impact" evidence does not fall within the first seven specific statutory mitigating circumstances. I also agree that such evidence does not fall within the catchall mitigating circumstance, 42 Pa.C.S. § 9711(e)(8), as it does not go to the defendant's character, his record or the circumstances of the offense. This does not resolve the inquiry, however, as our holding in *Means* was based on the very proposition that evidence in a capital sentencing hearing is not necessarily limited to the enumerated mitigating and aggravating circumstances.

In *Means*, the defendant argued that because victim impact evidence was not related to an aggravating or mitigating factor set forth in the sentencing statute, it could not be presented to a jury during a penalty phase proceeding. This Court rejected this proposition on the ground that "Pennsylvania's sentencing scheme does not limit the evidence admissible in the penalty phase to only the information necessary to establish aggravating and mitigating circumstances." *Id.* at

153. Quoting *Commonwealth v. Abu Jamal,* 521 Pa. 188, 555 A.2d 846, 858 (1989), the Court in *Means* stated:

> We do not read the statute as limiting the scope of the sentencing hearing to this extent. The legislature has directed that "[I]n the sentencing hearing, evidence may be presented *as to any matter that the court deems relevant* and admissible on the question of the sentence to be imposed *and shall include matters relating to any of the aggravating or mitigating circumstances* specified in subsections (d) and (e)." 42 Pa.C.S. § 9711(a)(2).

*Commonwealth v. Means,* 773 A.2d at 152 (emphasis supplied).

Thus, the majority's finding that "third party impact" evidence does not fall within any enumerated mitigating circumstance is of no significance. The issue becomes simply whether evidence of the impact of the crime on the defendant's family is relevant to the imposition of sentence. I must admit that my finding of relevancy in "third party impact" evidence is tied solely to the relevance the Court found in victim impact evidence. Once a value is permitted to be placed on the life of the victim, should not the defendant's family be permitted to testify that the defendant's human existence is likewise worthy of value in the eyes of the jury?

Accordingly, because our Court has opened the door to allow the jury to hear evidence regarding the impact of the victim's death, the door should not now close when the defendant attempts to offer evidence as to the impact the execution will have on his benefactors. Due to this disparity in treatment, I would reverse the sentence of death and remand for a new penalty hearing during which the defendant may present "third party impact" evidence.